## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LESLIE MOORE, individually and as representative of a class of similarly situated participants in the SNAP-ON, INC. 401(k) SAVINGS PLAN, <br><br> Plaintiff, <br><br> v. <br><br> SNAP-ON, INC., SNAP-ON INCORPORATED RETIREMENT PLANS COMMITTEE, and MERCER (US) LLC, <br><br> Defendants. | Civil Action No.: 5:25-cv-7401 <br><br> **CLASS ACTION COMPLAINT** |

1.      Plaintiff Leslie Moore ("Plaintiff"), by and through his undersigned attorneys, on behalf of the Snap-on, Inc. 401(k) Savings Plan (the "Plan"), himself, and all others similarly situated, states and alleges as follows:

### INTRODUCTION

2.      Snap-on, Inc. ("Snap-on") is a multi-national company that offers a retirement plan, the Snap-on Incorporated 401(k) Savings Plan, to its United States-based employees.

3.      The retirement plan is a 401(k) plan, and the investment options within it are chosen by Snap-on through the Snap-on Incorporated Retirement Plans Committee (the "Committee").

4.      The Committee is responsible for overseeing the retirement plan and serves as the plan administrator.

5.     These investments are made in consultation with Mercer (US) LLC ("Mercer"), who acts as the Plan's Investment Advisor.

6.     Snap-on, the Committee, and Mercer (together, "Defendants") serve as fiduciaries of the Plan.

7.     This case involves multiple breaches of fiduciary duties under the Employment Retirement Income Security Act, 29 U.S.C. §§ 1001–1461 ("ERISA"), by Defendants.

8.     ERISA requires fiduciaries of retirement plans to closely monitor plan investments, to remove imprudent investments within a reasonable time, and to make all investment decisions solely in the interest of the plan's participants and beneficiaries. ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).

9.     Defendants breached their fiduciary duties to the Plan, their duty of prudence under ERISA, and their other duties under ERISA by:

a.  Maintaining funds as investment options in the Plan when those funds:

- Significantly underperformed the benchmarks they were supposed to track;

- Significantly underperformed compared to the risk that they posed, as evidenced by something called the "information ratio";

- Had too much turnover based on industry standards, meaning that they sold too many of their assets in any given year;

- Had management expenses that were too high; and

- Failed to consider lower cost alternatives to the T. Rowe Price target date funds, with some of those alternatives being lower-cost share classes in the same funds that were functionality identical to the target date funds.

b. Failing to monitor the performance of the fund options and replace underperforming funds with better performing funds that were available.

c. Employing Mercer to provide supposed investment advice, when in fact Mercer provided no real advice and added no real value, instead merely siphoning Plan assets away.

10.    Employers who offer 401(k) plans to their employees have a duty to make sure that the Plan, including the investment options available to employees, are always in the best interest of the employees.

11.    Defendants here blatantly failed to fulfill that duty in many ways. That makes Defendants liable to Plaintiff and other Plan participants.

12.    Many other courts have recognized that employers and 401(k) service providers are liable in situations just like this one, and this Court should do the same thing.

## **PARTIES**

13.    Leslie Moore is a United States citizen residing in Bangor, Pennsylvania and during the Relevant Time Period was a participant in the Plan under 29 U.S.C.

§ 1002(7). During the Relevant Time Period, Moore maintained an investment through the Plan in the T. Rowe Price 2035 target date fund.

14.    Snap-on, Inc. was incorporated, and is existing, under the laws of the State of Delaware. Snap-on's principal place of business is located in Kenosha, Wisconsin.

15.    Snap-on Incorporation Retirement Plans Committee is an organization within Snap-On, and is controlled and directed by Snap-On. The Committee maintains its address at Snap-on's principal place of business in Kenosha, Wisconsin.

16.    Mercer (US) LLC was incorporated, and is existing, under the laws of the State of Delaware. Mercer's principal place of business is located in New York, New York.

17.    Defendants regularly conduct and transact business throughout the United States, including in the State of Pennsylvania, where Moore resides and was employed by Snap-on.

## **JURISDICTION & VENUE**

18.    Subject matter jurisdiction over this matter is conferred upon and vested in this Court under 28 U.S.C. §§ 1331 and 1332.

19.    This Court has personal jurisdiction over Defendants because Defendants regularly conduct and transact business within this District, including selling products and employing individuals like Moore, who resided in this District during his employment with Snap-on and continues to do so.

20.     Venue is proper in this Court pursuant to 29 U.S.C. § 1132(e)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

21.     This action has been brought within all applicable statutes of limitations and/or repose.

## FACTUAL ALLEGATIONS

### I.     General Principles of 401k Plans.

22.     Defined contribution plans have become the primary form of retirement saving in the United States as employer-provided defined benefit plans, such as pensions, have become increasingly rare.

23.     Defined contribution plans do not offer a guaranteed benefit and as a result participants bear the risk of high fees and investment underperformance.

24.     Participants each have an individual account, where their own contributions and those made on their behalf by their employer, are allocated.

25.     Participants are then free to make investments from a selection of options chosen by the plan administrator, who is a named fiduciary for the plan.

26.     A Qualified Default Investment Option ("QDIA") is a default investment choice available to a plan participant who does not specify how to invest their retirement contributions.

27.     QDIAs are selected by plan fiduciaries and automatically receive contributions if participants do not make investment choices, which ensures that a substantial portion of plan assets are invested in the QDIA.

28.    Like any other investment option, plan fiduciaries are responsible for the prudent selection and continuous monitoring of an appropriate QDIA.

## II.    The Plan and its Fiduciaries.

29.    Snap-on is a global developer, manufacturer, and marketer of tool and equipment solutions for professional tool users that employees around 12,600 people worldwide.

30.    Snap-on offers its employees the chance to participate in and contribute their wages to a defined contribution retirement plan called the Snap-on Incorporated 401(k) Savings Plan.

31.    At the end of 2024, the plan had 9,632 participants and beneficiaries and cumulative assets available for benefits of $983,243,582.

32.    The Committee is the plan administrator for the Plan.[1]

33.    Among other things, the Plan Administrator is responsible for "establish[ing] and review[ing] a funding policy which focuses on the Investment Funds offered under the Plan" and "oversee[ing] the investment of Plan … and to contract with one or more investment managers for the benefit of the Plan."[2]

34.    The Plan Administrator has never adopted a formal investment policy statement or funding policy.

---

[1] *See* Snap-On Inc. 401(k) Savings Plan, Plan Agreement, Section 15.3.
[2] *Id*. at 15.4.

35.    The Committee is also responsible for "monitor[ing] the performance and fees of the Plan's investments, including remove[ing]/replacing investment funds (as needed)."[3]

36.    In addition to the Committee, Snap-on has worked with an investment advisor, Mercer, since 2011 to "[a]ssist the Committee in the overall supervision of the Plan's investment funds", "[e]valuate the Plan's investment program and monitor plan investment performance/fees on an ongoing basis", "[a]ssist the Committee with investment objectives and plan structure, as appropriate", "[o]ffer guidance and recommendations to the Committee in the selection, retention and removal of investment options", and "[k]eep the Committee informed on current investment or capital market-related trends and issues."[4]

37.    Mercer is an ERISA §3(21) co-fiduciary advisor. In other words, Mercer's role is to make recommendations to the Committee, while the Committee makes the final investment decisions.

38.    According to the Investment Monitoring Process, the Committee worked directly with Mercer "to develop and/or review and approve investment recommendations covering broad investment decisions."[5]

---

[3] Snap-On Inc. 401(k) Savings Plan, Investment Monitoring Process ("Investment Monitoring Process"). Although the Committee has chosen not to adopt a formal investment policy statement, this Investment Monitoring Process document outlines the process that the Committee and Mercer allegedly use to select and monitor plan investments.

[4] *Id*.

[5] *Id*. Plaintiff was denied access to Mercer's service agreements, meeting minutes and quarterly monitoring reports, and were informed that Defendants did not have an

39.     As part of their review process, Mercer provided Defendants with quarterly monitoring reports on the Committee's options for participants and beneficiaries of the Plan.[6]

40.     According to the Investment Monitoring Process, the focus of Mercer's review and reports is the three- and five-year period before each Committee meeting and Plan investment review.[7]

### III.    Fiduciary Duties Under ERISA.

41.     ERISA imposes strict obligations on fiduciaries, including the duty of prudence, the duty of loyalty, the duty to adhere to plan documents, and the requirement to refrain from any prohibited transactions. These obligations apply to all fiduciary acts, including the monitoring, and retention of investment options for the Plan.

42.     ERISA's duty of prudence requires fiduciaries to discharge their responsibilities "with the care, skill, prudence, and diligence" that a prudent person "acting in a like capacity and familiar with such matters would use." ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B). Even in a defined contribution plan in which participants choose their investments, plan fiduciaries have the duty to rigorously and independently evaluate each of the plan's investment choices to determine which may be prudently included in the plan's menu of options.

---

investment policy, despite the Plan's funding policy requiring written investment guidelines.
[6] *Id.*
[7] *Id.*

43.    As part of their fiduciary duties, fiduciaries have "a continuing duty to monitor [ ] investments and remove imprudent ones" that exists "separate and apart from the [fiduciaries'] duty to exercise prudence in selecting investments." *Tibble v. Edison Int'l*, 575 U.S. 523, 529 (2015).

44.    Defendants breached their fiduciary duties to the Plan by retaining certain JPMorgan and T. Rowe Price funds as investment options in the Plan for over a decade despite their underperformance and excessive expenses.

45.    The general duties of loyalty and prudence imposed by ERISA § 404, 29 U.S.C. § 1104, are supplemented by a detailed list of transactions that are expressly prohibited by ERISA § 406, 29 U.S.C. § 1106, and are considered "*per se*" violations because they entail a high potential for abuse. ERISA § 406(a)(1), 29 U.S.C. § 1106(a)(1), states, in pertinent part, that:

Except as provided in section 1108 of this title: **(1)** A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect— . . . **(C)** furnishing of goods, services, or facilities between the plan and a party in interest. ERISA § 406(b), 29 U.S.C. § 1106(b), further provides, in pertinent part, that:

A fiduciary with respect to a plan shall not—

> **(1)** deal with the assets of the plan in his own interest or for his own account,
> **(2)** in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or

**(3)** receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

46.    Defendants also breached their fiduciary duties to the Plan by engaging in a prohibited transaction by directing Mercer's compensation to be taken from all the Plan's participants' benefits during the Relevant Time Period.

47.    Mercer recklessly assisted the Committee in retaining imprudent investment options and failing to properly monitor investment options. Mercer did not benefit the participants and therefore was not necessary for the Plan's operation, and its compensation was detrimental to the Plan, harming all participants' accounts in violation of ERISA.

## IV.    The Underperforming Funds.

48.    There are two series of funds that are at issue in this case: the JPMorgan U.S. Equity Fund and the T. Rowe Price target date funds.

49.    Both series of funds are actively managed. In other words, managers make discretionary changes to the funds' allocations of stocks, bonds, and cash over time.

### JPMorgan U.S. Equity Fund

50.    The JPMorgan U.S. Equity Fund was added to the Plan in 2015 as an investment option to Plan participants.

51.    The JPMorgan U.S. Equity Fund remained in the Plan until 2025.

52.    The JPMorgan U.S. Equity Fund is a mutual fund that is focused on long-term capital growth by investing a mix of stocks.

### T. Rowe Price target date funds

53.     The T. Rowe Price target date funds were added to the Plan in 2015 as investment options.[8]

54.     The T. Rowe Price target date funds remain available as current investment options in the Plan.

55.     A target date fund is defined by Morningstar® as a "fund of funds," or a fund that focuses on purchasing shares in other mutual funds rather than individual securities.

56.     Often, a fund cannot be identified as a target date fund by its name alone, rather it is its prospectus (*i.e.*, the fund's charter) and other fund documents that show the fund to be a target date fund.

57.     Target date funds are an investment option that offers a comprehensive retirement plan by investing in a mix of funds that become more conservative as the projected retirement year approaches.

58.     The T. Rowe Price target date funds serve as QDIAs in the Plan. In other words, if participants do not elect a specific fund to allocate their contributions to, they will automatically be invested in the T. Rowe Price target date funds.

59.     T. Rowe Price's target date funds include a variety of other T. Rowe Price funds. All of the T. Rowe Price target date funds hold the same underlying

---

[8] At the time that Defendants began including T. Rowe Price's target date funds these funds were named, *inter alia*, "T. Rowe Price Retirement 2015 Active Trust." However, in 2016, T. Rowe Price announced that it would no longer include the word "Active" in the title of these funds. Despite this change, from 2016 to 2024, Snap-on continued to call the funds "Active" on its Form 5500s.

funds, just in different percentages. For example, the top 10 holdings in the T. Rowe Price 2035 Target Date Fund on December 31, 2022 were:

| | |
|---|---|
| T. Rowe Price Value Z | 14.36% |
| T. Rowe Price Growth Stock Z | 12.80% |
| T. Rowe Price Equity Index 500 Z | 8.16% |
| T. Rowe Price New Income Z | 6.70% |
| T. Rowe Price Overseas Stock Z | 6.45% |
| T. Rowe Price International Value Eq Z | 5.76% |
| T. Rowe Price International Stock Z | 5.45% |
| T. Rowe Price US Treasury Money Z | 4.10% |
| T. Rowe Price Real Assets Z | 3.77% |
| T. Rowe Price Mid-Cap Growth Z | 3.16% |

60.     The biggest fund in the target date fund is the T. Rowe Price Value Z fund ("Value Fund"), which is a large-cap value equity fund.[9] [10]

61.     The Value Fund has accounted for the largest portion of each Target Date Fund, including, but not limited to, 2005, 2010, 2015, 2020, 2025, 2030, 2035, 2040, 2045, 2050, 2055, 2060, and 2065.

62.     The Value Fund consisted of 49% of "value" stocks from 2013 to 2018 and 51% of blend and growth stocks.[11]

63.     Value stocks are shares of a company that appear to be trading for less than their worth.

---

[9] Large-cap refers to stocks in companies with market capitalization of over $10 billion. An equity fund is a form of mutual fund that invests in stocks or equities.

[10] Upon information and belief, the reason that the T. Rowe Price target date funds are composed of such large percentages of the Value Fund is to increase T. Rowe Price's own profits, as the assets in the Value Fund have decreased sharply since 2019. In 2019, the Value Fund had $16.995 billion invested, whereas in 2024 the Value Fund had only $3.376 billion invested. The more money invested in a fund, the higher the fees, and thus income, for T. Rowe Price.

[11] Despite its name, the Value Fund at no time during the Relevant Time Period contained more "value" stocks than "growth" and "blend" stocks.

64.    A growth stock is a stock of a company that is anticipated to grow at a rate above market growth.

65.    Blend stocks are a mix of both value and growth stocks.

66.    At no time in the past five years has the fund had more than 50% of value stocks.

## V.    Breaches of Fiduciary Duty.

### a. Defendants Improperly Maintained Funds as Investment Options.

67.    Defendants breached their fiduciary duties to the Plaintiff and the Plan's participants by maintaining the underperforming JPMorgan U.S. Equity Fund and T. Rowe Price target date funds as Plan investment options.

### i. The Funds Significantly Underperformed Benchmarks.

68.    The goal of an active manager is to beat a benchmark—usually a market index or a combination of indices—by taking more risk than the relevant index or indices.[12]

69.    Market research has shown that investors should be cautious about certain actively managed funds' ability to consistently beat their benchmarks, which is a major concern for long-term retirement savers, including Plan participants and beneficiaries.

---

[12] *See* Ashley Kilroy, *What Is Active Management and Is It Right For You?*, SmartAsset Advisor, LLC, February 16, 2023, available at https://smartasset.com/financial-advisor/active-management ("[t]he goal of active management is to outperform a specific market index or, in a market downturn, to book losses that are less severe than a specific market index suffers").

70.    Although they may find success over short timeframes, active fund managers rarely manage to time their trades well enough to beat the market.

71.    This means that retirement plan fiduciaries must carefully analyze each active fund's ability to provide value and, if they deem that a fund does not, replace it with an active or passive fund that has demonstrated such capabilities.

72.    The Investment Management Process states that "funds have a stated benchmark which the investment team aims to track (passively-managed funds) or outperform (actively-managed funds)."

73.    According to the Investment Management Process, benchmarks tend to be market indices, such as the S&P 500 Index or the Russell 1000 Growth Index.

74.    Both funds have a benchmark of the Russell 1000 Growth Index, which has similar risks, aims, rewards, and characteristics to the funds.[13]

75.    Similar to the goal of the JPMorgan U.S. Equity Fund and the T. Rowe Price target date funds, the Russell 1000 Growth Index tracks the large-cap growth segment of the U.S. stock market.

76.    The Russell 1000 Growth Index includes companies with relatively higher price-to-book ratios, higher forecast medium-term growth, and higher sales-

---

[13] The Russell 1000 Growth Index is the appropriate benchmark for both the JPMorgan U.S. Equity Fund and T. Rowe Price target date funds. On the Plan's Plan and Investment Disclosure, the benchmarks listed are the S&P 500 Index and the S&P Target Date Indices, respectively. The Russell 1000 Growth Index, however, is the proper benchmark because the holdings contained in both funds better match the Russell 1000 Growth Index.

per-share historical growth, similar to those included in the JPMorgan U.S. Equity Fund and the T. Rowe Price target date funds

77.     Defendants, according to Plan documents, evaluate the Plan's investment options on a quarterly basis.

78.     Evaluation consists of comparing the fund's performance relative to its benchmark over rolling three- and five-year periods.

79.     Per the Plan documents, "should an investment option underperform for a sustained period of time or should some other material change, or concern arise … the Committee may" supplement, replace, or eliminate the investment.

80.     Underperformance over a three- or five-year period is a cause for concern and scrutiny and can itself be a reason to remove an investment from a plan.

81.     Underperformance over several consecutive three- or five-year trailing periods is cause for both alarm and action.

82.     Underperformance can cost Plan participants thousands or hundreds of thousands of dollars in retirement funds. For example, if a participant with an account balance of $106,163, the average balance of a participant in the Plan, were to have a return that was 0.5% less, that would result in a harm of $3,195.47 over five years.

### JPMorgan U.S. Equity Fund

83.     The JPMorgan U.S. Equity Fund underperformed its benchmark, the Russell 1000 Growth Index, every year from 2015, when it was added to the Plan, to 2024.

84.    From 2017 to 2019, the JPMorgan U.S. Equity Fund had a 3-year average return of 10.95%, while the Russell 1000 Growth Index had an average return of 13.97%.

85.    From 2015 to 2019, the JPMorgan U.S. Equity Fund had an average 5-year return of 11.70%, while the Russell 1000 Growth Index had an average return of 13.36%.

86.    From 2018 to 2020, the JPMorgan U.S. Equity Fund had an average 3-year return of 12.97%, while the Russell 1000 Growth Index had an average return of 17.40%.

87.    From 2016 to 2020, the JPMorgan U.S. Equity Fund had an average 5-year return of 11.50%, while the Russell 1000 Growth Index had an average return of 14.69%.

88.    Given that the JPMorgan U.S. Equity Fund consistently failed to outperform or even meet its appropriate benchmark, Defendants should have removed the fund.

89.    Had Defendants properly reviewed the JPMorgan U.S. Equity Fund according to the Plan documents, they would have seen its underperformance and prudently considered its removal or elimination.

### T. Rowe Price target date funds

90.    The Value Fund, which makes up a large part of all of T. Rowe Price's target date funds, consistently underperformed its benchmark, the Russell 1000 Growth Index, while it was offered as an investment to Plan participants.

91.     From 2016 to 2020, the five-year average return of the Value Fund was 39.75% lower than the return of the Russell 1000 Growth Index.

92.     From 2017 to 2021, the five-year average return of the Value Fund was 37.8% lower than the return of the Russell 1000 Growth Index.

93.     From 2018 to 2022, the five-year average return of the Value Fund was 9.41% lower than the return of the Russell 1000 Growth Index.

94.     Again, considering this consistent underperformance, Defendants should have removed the T. Rowe Price target date funds.

> ### ii. The Funds Significantly Underperformed Compared to the Risk That They Posed, as Evidenced by Something Called the "Information Ratio".

95.     The Information Ratio is a measure of return versus risk in a given fund.

96.     To calculate the Information Ratio, the return is divided by the risk. Specifically, the ratio measures return over risk when compared to a benchmark fund.

97.     If a fund consistently has a return of 2% more than its benchmark, and the standard deviation of that return relative to the benchmark is 4%, then the Information Ratio would be 0.5.

98.     A 0.5 Information Ratio is generally the minimum acceptable by investors and responsible plan fiduciaries.

99.     An Information Ratio of 1.0 or higher is ideal because it means that the risks taken are met or exceeded by the returns.

100.    A negative Information Ratio suggests that the benchmark may be a better investment because the benchmark is consistently outperforming the fund. Even a low (less than 0.5) Information Ratio may indicate that the benchmark is a better investment.

101.    Morningstar® regularly reports Information Ratios for funds over periods of one, three, five, ten, fifteen, and twenty years.

102.    According to the Investment Monitoring Process, Mercer's quarterly reports focus on "Quantitative Metrics."

103.    These metrics include measuring the performance of a given fund by looking at its "return/risk" relative to the "index (benchmark) over rolling 3 & 5 year periods."

104.    In other words, Mercer specifically stated that it would use three- and five-year Information Ratios to monitor the performance of the Plan's funds.

### JPMorgan U.S. Equity Fund

105.    In 2020, the Morningstar® five-year Information Ratio for the JPMorgan U.S. Equity Fund was 0.41.

106.    This Information Ratio was below the industry standard of 0.5.

107.    The Morningstar® Information Ratios from 2016 to 2019, which Defendants would have had access to in 2020, also fell below the desired ratio:[14]

| 2020 | 2019 | 2018 | 2017 | 2016 |
|------|------|------|------|------|
| 0.41 | (0.27) | (0.33) | 0.18 | 0.24 |

---

[14] The parentheses indicate a negative Information Ratio.

18

108.    As a result, Defendants should have removed the JPMorgan U.S. Equity Fund in 2020 upon seeing the fund's subpar Information Ratio because the returns it received were inconsistent with the risks taken.

109.    Mercer should have advised Defendants to remove the JPMorgan U.S. Equity Fund.

### T. Rowe Price target date funds

110.    From 2020 to 2024, the T. Rowe Price Value Fund's Morningstar® Information Ratio was (1.01), (0.79), (0.27), (0.50), and (0.58), respectively.

111.    The Information Ratio for all five plan years was negative. In other words, the Information Ratio never approached the industry standard of 0.5.

112.    Prior to 2020, the Information Ratio was consistently low. From 2015 to 2019 the Morningstar® Information Ratio was 0.16, 0.20, 0.06, (0.91), and (1.13), respectively.

113.    The fund's poor Information Ratios demonstrate that the fund was failing to perform at the level of its benchmark and that removal was therefore proper.

114.    Were Defendants acting prudently, they would have removed the T. Rowe Price target date funds.

115.    Serving in an advisory capacity, Mercer should have advised Defendants to remove the T. Rowe Price target date funds.

> **iii.  The Funds Had Too Much Turnover Based On Industry Standards, Meaning That They Sold Too Many Of Their Assets In Any Given Year.**

116.    A key indicator to fiduciaries of a funds' underperformance, and therefore necessary removal, is its turnover rate.

117.    The turnover rate of a fund indicates how long it holds onto its stocks after purchasing them.

118.    A higher rate suggests the fund often sells stocks it bought earlier in the year.

119.    Selling stocks frequently suggests that a portfolio manager's strategies are shifting between large and small stocks, as well as value and growth stocks.

120.    A fund with a long-term strategy typically holds onto about 80% of the stocks it purchases within a calendar year, resulting in a turnover rate of around 20%.

121.    A turnover rate of 30% or more is considered problematic.

122.    The U.S. Securities and Exchange Commission ("SEC") estimates that a 50% turnover can increase an investor's annual trading costs by 0.5% to 1% and decrease their yearly returns by 10% to 20%.

## JPMorgan U.S. Equity Fund

123.    The JPMorgan U.S. Equity fund's prospectus strategy emphasizes long-term capital growth as its main goal by investing in undervalued large-cap stocks.

124.    Despite having a stated long-term strategy, the JPMorgan U.S. Equity Fund had an average turnover rate of 64% during each plan year from 2020 to 2024. In other words, the fund's portfolio manager sold or traded an average of 64% of its entire portfolio of stocks each year.

125.    The JPMorgan U.S. Equity Fund's high turnover rate should have alerted a prudent fiduciary to its underperformance.

126.    A prudent fiduciary would have removed the JPMorgan U.S. Equity fund prior to 2025 to ensure greater stability and returns for the Plan's participants and beneficiaries.

### T. Rowe Price target date funds

127.    Between 2013 and 2024, the T. Rowe Price Value Fund had the following turnover rates:

| Turnover % | 2024 | 2023 | 2022 | 2021 | 2020 | 2019 | 2018 | 2017 | 2016 | 2015 | 2014 | 2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| T. Rowe Price Value Fund | 62 | 192 | 107 | 115 | 140 | 146 | 96 | 107 | 68 | 54 | 44 | 56 |

128.    From 2013 to 2024, the T. Rowe Price Value Fund had a median turnover of 101.5%. In other words, by December 31 of each year, the portfolio manager had sold all of his purchases since January 1 of that year.

129.    The high turnover rate indicates a level of instability and uncertainty that was unwise for Defendants to ignore as fiduciaries.

130.    Since the T. Rowe Price Value Fund made up such a large part of each T. Rowe Price target date funds in the Plan, a prudent fiduciary should have assessed the turnover rate and recognized its importance in evaluating the fund.

131.    A prudent fiduciary would have removed the T. Rowe Price target date funds to ensure greater stability and returns for the Plan's participants and beneficiaries.

### iv.  The Funds Had Expenses That Were Too High.

132.    Defendants have a duty to prudently select and monitor compensation paid to covered service providers, such as Mercer, to ensure that only reasonable compensation is paid.

133.    The failure to monitor fees and costs for reasonableness can have stark financial consequences for retirees. Extra expenses imposed on plan participants compound over time and reduce the value of participants' investments available upon retirement.

134.    The U.S. Department of Labor estimates that 1% more of fees over a 35-year period results in a 28% difference in retirement assets when a participant retires.[15]

135.    During the Relevant Time Period, Defendants caused the Plan to pay management fees to Mercer that far exceeded the reasonable market rate.

136.    Over the past six years, Mercer has charged the plan an average of $25,000 per year for its services.

137.    The Capital Group, one of the largest mutual fund families in the United States, released a survey on how much time financial advisors spend on a single 401(k) plan.[16] The survey found that financial professionals typically spend around 53 hours per year on plans similar to the Plan.

---

[15] A Look at 401(k) Plan Fees, UNITED STATES DEPT. OF LABOR, at 1-2 (Sept. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our activities/resourcecenter/publications/a-look-at-401k-plan-fees.pdf

[16] *See* WinMore Plans, "Level-Up: Benchmarking Your Retirement Practice + other lessons        from              legends,"          April          4,              2024;

138.    According to *Fee Benchmarker®*, a book used by fund managers that breaks down fees and services provided by plan providers, the average hourly rate of a plan advisor like Mercer is $306 per hour.[17]

139.    Had Mercer billed the national average of 53 hours per year at the average rate of $306 per hour, it would have charged the Plan $16,218 per year.

140.    Mercer's average of $25,000 per year exceeds this amount by almost $10,000.

141.    Upon information and belief, there are no reasons why Mercer continues to be paid in excess amounts by the Plan.

142.    Further, as discussed in greater detail below, Mercer has failed to provide value to the fund.

> **v.  Defendants Failed to Remove the T. Rowe Price Target Date Funds in Favor of Cheaper but Functionally Identical Share Classes and Collective Trusts.**

143.    Mutual funds, like the T. Rowe Price target date funds, are publicly traded investment vehicles that pool money from many investors to invest in a portfolio of stocks, bonds, and other securities. They are managed by professional investment advisors, who, along with mutual funds, are registered with and regulated by the SEC.

144.    Mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors.

---

https://www.capitalgroup.com/advisor/insights/articles/ir-retirement-plan-service-by-the-numbers.html?msockid=3e98c1efbee36f47081bd74fbf356e63.

[17] *See* Ann Schleck & Co., *Fee Benchmarker®*, in ADVISOR FEE ALMANAC (2017).

145.    These share classes follow the same investment objectives and policies, but their fees and expenses differ. Often share classes differ in terms of initial investment amount. "Retail" share classes typically require a low initial purchase minimum of $1,000 to $2,000 while "institutional" share classes may require upwards of a $1,000,000 purchase minimum.

146.    Defendants chose T. Rowe Price target date funds that were more costly than other share classes that were identical except for the expenses, resulting in higher expenses for plan participants and beneficiaries with little to no benefit.

147.    T. Rowe Price provides share classes that cost five basis points or more less annually than the class available through the Plan.

148.    The Defendants offered the participants and beneficiaries the F class, which has the second-highest fees at .37%.

### *T. Rowe Price Share Class Prices, 2025 plan year.*

| Name | Expense % | Portfolio manager(s) |
|---|---|---|
| T. Rowe Price Ret 2035 Tr-A | 0.38 | *Wyatt A. Lee; Kimberly E. DeDominicis; Andrew G. Jacobs van Merlen;* |
| T. Rowe Price Ret 2035 Tr-B | 0.36 | *Wyatt A. Lee; Kimberly E. DeDominicis; Andrew G. Jacobs van Merlen;* |
| T. Rowe Price Ret 2035 Tr-C | 0.34 | *Wyatt A. Lee; Kimberly E. DeDominicis; Andrew G. Jacobs van Merlen;* |
| T. Rowe Price Ret 2035 Tr-D | 0.32 | *Wyatt A. Lee; Kimberly E. DeDominicis; Andrew G. Jacobs van Merlen;* |
| T. Rowe Price Ret 2035 Tr-E | 0.30 | *Wyatt A. Lee; Kimberly E. DeDominicis; Andrew G. Jacobs van Merlen;* |
| T. Rowe Price Ret 2035 Tr-F | 0.37 | *Wyatt A. Lee; Kimberly E. DeDominicis; Andrew G. Jacobs van Merlen;* |
| T. Rowe Price Ret 2035 Tr-G | 0.29 | *Wyatt A. Lee; Kimberly E. DeDominicis; Andrew G. Jacobs van Merlen;* |
| T. Rowe Price Ret 2035 Tr-H | 0.28 | *Wyatt A. Lee; Kimberly E. DeDominicis; Andrew G. Jacobs van Merlen;* |

| T. Rowe Price Ret 2035 Tr-J | 0.27 | *Wyatt A. Lee; Kimberly E. DeDominicis; Andrew G. Jacobs van Merlen;* |
| T. Rowe Price Ret 2035 Tr-K | 0.26 | *Wyatt A. Lee; Kimberly E. DeDominicis; Andrew G. Jacobs van Merlen;* |

### *T. Rowe Price 2035 target date fund Assets and Fees.*

| Plan year | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|
| *Participants' $* | $39,096,645 | $49,201,472 | $43,341,905 | $56,587,249 | $68,906,948 |
| *F class 0.37%/yr* | $144,658 | $182,045 | $160,365 | $209,373 | $254,956 |

149.    The F class's .37% fee cost the Plan $254,956 in fees in 2024.

150.    By comparison, were the Plan to have elected to invest in the K class, the .26% fee would cost the Plan only $179,158.

151.    Upon information and belief, the other share classes are identical in all other ways except for cost.

152.    Defined contribution plans with substantial assets, like the Plan, have significant bargaining power and can demand lower cost share classes in the marketplace.

153.    Given the Plan's size, expected growth, and resulting negotiating power, with prudent management and administration, the Plan should unquestionably have been able to switch to share classes that were significantly lower cost than the F class fees above.

154.    Prudent fiduciaries will use their bargaining power to select the lowest-priced share class available.

155.    Defendants failed to prudently monitor the Plan to determine whether the Plan was invested in the lowest-cost share available.

156.     Accordingly, by failing to transfer the Plan's assets into a cheaper share class, Defendants breached their fiduciary duty.

157.     Defendants also failed to adequately investigate non-mutual fund alternatives such as collective trusts.

158.     Collective trusts are essentially mutual funds that are not regulated by the SEC and offer more flexibility in fee negotiations.

159.     Collective trusts offer identical funds managed by the same managers and holding the same underlying assets, with the primary difference being costs and revenue-sharing with a party-in-interest for the benefit of and under the direction of Defendants.

160.     Defendants could have used the Plan's bargaining power to invest in a collective trust, which would reduce the fees charged to Plan participants.

161.     By failing to investigate this alternative, Defendants caused the Plan unnecessary fees.

### b. Defendants Failed to Monitor the Performance of the Fund Options and Replace Underperforming Funds With Better Performing Funds That Were Available.

162.     Given the JPMorgan U.S. Equity Fund and the T. Rowe Price Value Fund's consistent underperformance and other issues, Defendants should have replaced the funds with better performing funds.

163.     Given that Defendants monitored the funds on a quarterly basis, there were repeated opportunities for them to monitor the funds' underperformance and act accordingly.

164.    Had such monitoring and analysis been conducted, operating within the ordinary scope of the fiduciary duty of prudence, Defendants would have determined that the JPMorgan U.S. Equity Fund and the T. Rowe Price Value Fund had substantially underperformed over an extended period of time.

165.    This performance data represents information that was easily accessible to Defendants during the Relevant Time Period and would have been reviewed by prudent fiduciaries.

166.    The foregoing trends of both the JPMorgan Equity U.S. Fund and the T. Rowe Price Value Fund showed underperformance requiring a serious and deliberate decision as to whether there was any basis to retain the funds.

167.    However, Defendants ignored or were otherwise unaware of the failure of the funds, failed to investigate a replacement, and allowed the funds to remain even as their underperformance persisted.

168.    Defendants could have removed the JPMorgan U.S. Equity Fund or the T. Rowe Price target date funds, or requested that the Value Fund be removed from all target date fund offerings, but they failed to do so. They could also have sought out lower cost alternatives or lower cost functionally identical share classes, as alleged above.

169.    Defendants failed to do so, and as a result cost Plan participants valuable appreciation in their retirement funds.

170.    As such, Defendants breached their fiduciary duty to monitor the funds.

**c. Defendants Employed Mercer to Provide Supposed Investment Advice, When in Fact Mercer Provided No Real Advice and**

**Added No Real Value, Instead Merely Siphoning Plan Assets Away.**

171.    When service providers, such as Mercer, are paid directly from the Plan, they are paid from each participant with an account balance. In other words, each participant pays for Mercer's services quarterly from their investment account balance.

172.    This has resulted in each participant with an account balance paying Mercer to maintain costly, underperforming funds on the investment menu.

173.    Defendants employed Mercer to provide investment advice, however, as discussed above, Mercer provided no real advice and added no real value.

174.    From 2011 to 2019, Plan participants paid Mercer $206,250.00.

175.    From 2020 to 2024, Plan participants paid Mercer $125,000.00.

176.    Mercer has failed to provide any appreciable benefit to the Plan in exchange for its payment.

177.    As a result, each participant experienced a reduction in investment income.

<u>**CLASS ACTION ALLEGATIONS**</u>

178.    ERISA authorizes any plan participant or beneficiary to bring an action individually on behalf of the plan for appropriate relief under 29 U.S.C. § 1109(a) for a plan fiduciary's breach of duty, including all losses resulting from such breach and such other equitable or remedial relief the court may deem appropriate. *See* 29 U.S.C. § 1132(a)(2).

179.    Acting in this representative capacity, and as an alternative to numerous direct individual actions brought by participants on behalf of the Plan under 29 U.S.C. § 1132(a)(2), Plaintiff seeks to certify this action on behalf of all participants and beneficiaries of the Plan.

180.    Plaintiff seeks to certify the following class, and to be appointed as the representative on behalf of the following class:

> All participants and beneficiaries in the Snap-on Incorporated 401k Savings Plan at any time during the Relevant Time Period.

Excluded from the Class are Defendants and the Judge to whom this case is assigned or any other judicial officer having responsibility for this case.

181.    The Relevant Time Period is defined as six years prior to the filing of this Complaint and continuing through the date of judgment in this action.

182.    The Class includes thousands of members and is so large that joinder of all its members is impracticable, pursuant to Federal Rule of Civil Procedure 23(a)(1).

183.    There are questions of law and fact common to this Class pursuant to Federal Rule of Civil Procedure 23(a)(2), because Defendants owe fiduciary duties to the Plan and took the acts and omissions alleged as to the Plan and not as to any individual participant. Common questions of law and fact include but are not limited to:

a.  Whether Defendants are fiduciaries of the Plan;

b.  Whether Defendants breached their fiduciary duties under ERISA by retaining the T. Rowe target date funds;

c.  Whether Defendants breached their fiduciary duties under ERISA by retaining the JP Morgan U.S. Equity Fund;

d.  Whether Defendants engaged in prohibited transactions by using the services of Mercer and paying Mercer with Plan assets;

e.  Whether the Plan suffered losses from Defendants' breach(es);

f.  The manner in which the Plan's losses can be calculated; and

g.  What equitable relief, if any, is appropriate for Defendants' breach(es).

184.  Plaintiff's claims are typical of the claims of the Class pursuant to Federal Rule of Civil Procedure 23(a)(3) because Plaintiff was a Plan participant during the time period at issue and the participants in the Plan were harmed by Defendant's fiduciary misconduct in the same manner.

185.  Plaintiff will adequately represent the Class pursuant to Federal Rule of Civil Procedure 23(a)(4), because he was a Plan participant in the Plan during the Relevant Time Period, has no interest that conflicts with the Class, is committed to the vigorous representation of the Class, and has engaged experienced and competent counsel to represent the Class.

186.  Certification is appropriate under Federal Rule of Civil Procedure 23(b)(1), because prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (1) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants concerning their discharge of fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a), and (2) adjudications by individual

participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries who are not parties to the adjudication, or would substantially impair those participants' and beneficiaries' ability to protect their interests.

187.    Certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

188.    Plaintiff's attorneys are experienced in complex employment class actions, including ERISA litigation, and will adequately represent the Class.

**FIRST CLAIM FOR RELIEF**
**Breach of Fiduciary Duties**
**Against All Defendants**

189.    Plaintiff re-alleges and incorporates the prior paragraphs of this Complaint as if fully set forth herein.

190.    Defendants are fiduciaries of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

191.    Defendants' conduct, as set forth above, violates their fiduciary duties under Section 404(a)(1) (B) of ERISA, 29 U.S.C. § 1104(a)(1)(B). Defendants had an obligation to discharge their duties to the Plan and participants with the care, skill, prudence, and diligence of a competent investment fiduciary charged with

responsibility for investing millions of dollars of retirement savings on behalf of thousands of investors.

192.   29 U.S.C. § 1104(a)(1)(B) imposes a fiduciary duty of prudence upon Defendants in managing the investments of the Plan.

193.   Defendants, as fiduciaries of the Plan, are responsible for selecting and maintaining prudent investment options and taking any other necessary steps to ensure that the Plan's assets are invested prudently.

194.   During the Relevant Time Period, Defendants had a fiduciary duty to manage the assets of the Plan prudently and act with the care, skill, diligence, and prudence required by ERISA. Common law and ERISA's duty of prudence required Defendants to give appropriate consideration to those facts and circumstances that, given the scope of their fiduciary investment duties, they knew or should have known were relevant to the particular investments of the Plan and to act accordingly. *See* 29 C.F.R. § 2550.404a-1.

195.   During the Relevant Time Period, Defendants breached their fiduciary duties of prudence to Plan participants, including to Plaintiff, by:

   a. Maintaining funds as investment options in the Plan when those funds:

- Significantly underperformed the benchmarks they were supposed to track;

- Significantly underperformed compared to the risk that they posed, as evidenced by something called the "information ratio";

- Had too much turnover based on industry standards, meaning that they sold too many of their assets in any given year;

- Had management expenses that were too high; and

- Failed to consider lower cost alternatives to the T. Rowe Price target date funds.

b. Failing to monitor the performance of the fund options and replace underperforming funds with better performing funds that were available.

196.    Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, thereby breaching their fiduciary duties of prudence under 29 U.S.C. § 1104(a)(1)(B).

197.    As a result of Defendants' breach of fiduciary duty of prudence with respect to the Plan, the Plaintiff and Plan participants and beneficiaries suffered tens of millions of dollars in unreasonable and unnecessary monetary losses.

198.    Defendants are liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the Plan the losses resulting from the fiduciary breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breach of fiduciary duty alleged in this Count. In addition, Defendants are subject to other equitable relief pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2). Total losses to the Plan will be determined at trial after

complete discovery in this case and are illustrated herein based upon the limited information that has been available to the Plan's participants to date.

## SECOND CLAIM FOR RELIEF
**Failure to Adequately Monitor Other Fiduciaries Under ERISA
Against All Defendants**

199.    Plaintiff re-alleges and incorporates the prior paragraphs of this Complaint as if fully set forth herein.

200.    Defendants had the authority to appoint and remove members or individuals responsible for Plan investment management on the Administrative Committee, and were aware that these fiduciaries had critical responsibilities for the Plan.

201.    In light of this authority, Defendants had a duty to monitor those individuals responsible for Plan investment management on the Administrative Committee to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

202.    Defendants had a duty to ensure that the individuals responsible for Plan investment management on the Committee possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Defendants.

203.    Defendants breached their duty to monitor individuals responsible for Plan investment management, by, among other things:

a.  Maintaining funds as investment options in the Plan when those funds:

- Significantly underperformed the benchmarks they were supposed to track;

- Significantly underperformed compared to the risk that they posed, as evidenced by something called the "information ratio";

- Had too much turnover based on industry standards, meaning that they sold too many of their assets in any given year;

- Had management expenses that were too high; and

- Failed to consider lower cost alternatives to the T. Rowe Price target date funds.

b.  Failing to monitor the performance of the fund options and replace underperforming funds with better performing funds that were available.

204.    As a result of Defendants' foregoing breaches of the duty to monitor, the Plaintiff and Plan Participants suffered unreasonable and unnecessary monetary losses amounting to tens of millions of dollars. Had Defendants discharged their fiduciary duties prudently as described above, the losses suffered by the Plan would have been minimized or avoided.

205.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all loses caused by their failure to adequately monitor

35

individuals responsible for Plan investment management on the Administrative Committee. In addition, Plaintiff and the Class are entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

## THIRD CLAIM FOR RELIEF
**Prohibited Transactions**
**Against All Defendants**

206.    Plaintiff re-alleges and incorporates the prior paragraphs of this Complaint as if fully set forth herein.

207.    ERISA § 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C), requires a plan fiduciary to refrain from engaging in a transaction, if he knows or should know that the transaction constitutes a direct or indirect furnishing of goods, services, or facilities between the plan and a party in interest.

208.    ERISA § 406(a), 29 U.S.C. § 1106(b), provides, in pertinent part, that a fiduciary with respect to a plan shall not:

(1) deal with the assets of the plan in his own interest or for his own account, or

(2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or

(3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

209. By exercising authority and/or control with respect to the management of the Plan and their assets; and/or by rendering investment advice or by having authority or responsibility to render investment advice to the Plan; and/or by being designated in the governing document of the Plan as a fiduciary within the meaning of ERISA § 402(a), 29 U.S.C. § 1102(a), Defendants are fiduciaries of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), and ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1).

210. As the investment advisor to the Plan, the Defendant Mercer is a party in interest to the Plan within the meaning of ERISA § 3(14), 29 U.S.C. § 1002(14), from which it receives compensation.

211. Defendants engaged in a prohibited transaction by causing the Plan to engage in the above conduct in which a fiduciary to the Plan, in their individual or in any other capacity, acted on behalf of a party whose interests were adverse to the interests of the Plan or the interests of the Plan's participants or beneficiaries, in violation of ERISA § 406(b)(2), 29 U.S.C. § 1106(b)(2).

212. The compensation paid to Mercer was unreasonably high for its investment advisement services.

213. Further, Mercer's provision of investment management services was on a basis that was unfavorable to Plan participants and beneficiaries because Mercer failed to prudently monitor the Plan's JP Morgan and T. Rowe Price funds.

214.    As both fiduciaries and parties in interest, the Defendants are liable for these violations of ERISA § 406(b)(1), (2), and (3), 29 U.S.C. § 1106(b)(1), (2), and (3), pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2).

215.    As a direct and proximate result of the Defendants' breaches of fiduciary duties, the Plan have suffered millions of dollars of damages which continue to accrue and for which the Defendants are jointly and severally liable pursuant to ERISA § 502(a)(2) and 409(a), 29 U.S.C. § 1132(a)(2) and 1109(a).

216.    Each of the Defendants is liable to make good to the Plan, as a whole, the losses resulting from the aforementioned breaches and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. The Defendants are subject to other Plan-wide equitable or remedial relief as appropriate.

217.    Each Defendant also participated in the breach of the other Defendants, knowing that such acts were a breach, and/or enabled the other Defendants to commit a breach by failing to lawfully discharge their own fiduciary duties, and/or knew of the breach by the other Defendants yet failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the Plan-wide losses caused by the breach of its co-fiduciary duties under ERISA § 405(a), 29 U.S.C. § 1105(a).

## **PRAYER FOR RELIEF**

WHEREFORE, Moore on behalf of himself, the Class, and the Plan, prays the Court for a judgment against Snap-on as follows:

1.    find and adjudge that Defendants have breached their fiduciary duties as described above;

2.    find and adjudge that Defendants are personally liable to make good to the Plan the losses to the Plan as a whole resulting from each breach of fiduciary duty, and to otherwise restore the Plan to the position they would have occupied but for the breaches of fiduciary duties;

3.    order the Defendants to make good to the Plans as a whole the losses resulting from each breach of fiduciary duty and to restore to the Plans any profits resulting from each breach of fiduciary duty;

4.    find and adjudge that the Defendants are liable to the Plan for appropriate Plan-wide equitable relief, including but not limited to restitution and disgorgement;

5.    determine the method by which losses to the Plan under ERISA § 409(a), 29 U.S.C. § 1109(a), should be calculated;

6.    order Defendants to provide all accountings necessary to determine the amounts Defendants must make good to the Plan under ERISA § 409(a), 29 U.S.C. § 1109(a);

7.    impose surcharges against Defendants and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive, and/or in violation of ERISA;

8.    order the proceeds of any Plan-wide recovery for the Plan to be allocated to the accounts of members of the Class to make them whole for any injury that they have suffered as a result of the breaches of ERISA in accordance with the Court's declaration;

9.    certify the Class, appoint the Plaintiff as class representative;

10.   award to the Plaintiff and the Class their attorney's fees and costs under ERISA § 502(g)(1), 29 U.S.C. § 1132(g)(1), and the common fund doctrine;

11.   order Defendants to pay interest to the extent allowed by law; and

12.   grant such other equitable or remedial relief as the Court deems proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

This the 30th day of December, 2025.

Respectfully submitted,


*/s/ Kathryn Anne B. Robinson*
Kathryn Anne B. Robinson
P.A. Bar No. 335382
Matthew E. Lee*
N.C. Bar No.  35405
Jeremy R. Williams*
N.C. Bar No. 48162
Mark R. Sigmon*
N.C. Bar No. 37762
**LEE SEGUI, PLLC**
900 W Morgan St
Raleigh, NC  27603
Phone: (919) 600-5000
Fax: (919) 600-5035
krobinson@leesegui.com
mlee@leesegui.com
jwilliams@leesegui.com
msigmon@leesegui.com

*Attorneys for the Plaintiff, the Plan, and the Proposed Class*

*to be admitted pro hac vice*