**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
Civil Action No.: 5:25-cv-7401**

| | |
|---|---|
| LESLIE MOORE, individually and as representative of a class of similarly situated participants in the SNAP-ON, INC. 401(k) SAVINGS PLAN,<br><br>        Plaintiff,<br><br>v.<br><br>SNAP-ON, INC., SNAP-ON INCORPORATED RETIREMENT PLANS COMMITTEE, and MERCER (US) LLC,<br><br>        Defendants. | **FIRST AMENDED CLASS ACTION COMPLAINT** |

1.      Plaintiff Leslie Moore ("Plaintiff"), by and through his undersigned attorneys, on behalf of the Snap-on, Inc. 401(k) Savings Plan (the "Plan"), himself, and all others similarly situated, states and alleges as follows:

**INTRODUCTION**

2.      Snap-on, Inc. ("Snap-on") is a multi-national company that offers a retirement plan, the Snap-on Incorporated 401(k) Savings Plan, to its United States-based employees.  Snap-on is the Plan's sponsor.

3.      The retirement plan is a 401(k) plan, and the investment options within it are chosen by Snap-on through the Snap-on Incorporated Retirement Plans Committee (the "Committee").

4.      Snap-on appointed the Snap-on, Inc. Retirement Plans Committee (the "Committee") as Plan Administrator, responsible for overseeing the Plan.

5. During the Relevant Time Period, the Committee made investment decisions with the assistance of Mercer (US) LLC ("Mercer"), who acts as the Plan's Investment Advisor. Mercer is one of four subsidiaries of global professional services firm Marsh McLennan, which is publicly traded as a component of the S&P 500 (NYSE: MRSH).

6. Snap-on, the Committee, and Mercer (together, "Defendants") each serve as fiduciaries of the Plan.

7. This case involves multiple breaches of fiduciary duties under the Employment Retirement Income Security Act, 29 U.S.C. §§ 1001–1461 ("ERISA"), by Defendants.

8. ERISA requires fiduciaries of retirement plans to closely monitor plan investments, to remove imprudent investments within a reasonable time, and to make all investment decisions solely in the interest of the plan's participants and beneficiaries. ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).

9. Defendants breached their fiduciary duties to the Plan, their duty of prudence under ERISA, and their other duties under ERISA by:

    a. Failing to monitor the performance of the investment options in the Plan and remove those investments that significantly underperformed the benchmarks the investments set for themselves, particularly when compared to the risk that they posed, for several years in a row;

    b. Failing to monitor the costs of the investment options in the Plan, and move assets invested in more expensive asset classes of a certain

2

investment option into lower-cost but otherwise identical classes that had been available for years, and for which the Plan qualified, despite the millions of dollars in savings that would be realized for the Plan's participants due to such a move;

c. Utilizing a fundamentally deficient process to evaluate the performance and costs of the investments on the Plan's menu;

d. (On Snap-on's part) failing to monitor the performance of fiduciaries appointed to manage and direct investments in the Plan;

e. (On Snap-on's part) paying Mercer inflated sums from Plan Assets during the Relevant Time Period for its investment advice that far outpaced the pay for similar advisors by similarly-situated peers, and despite Mercer's failure to notice or appreciate any of the foregoing problems; and/or

f. Other ways to be proven at trial.

10. Employers who offer 401(k) plans to their employees have a duty to make sure that the Plan, including the investment options available to employees, are always in the best interest of the employees.

11. Defendants here blatantly failed to fulfill that duty in many ways. That makes Defendants liable to Plaintiff and other Plan participants.

12. Many other courts have recognized that employers and 401(k) service providers are liable in situations just like this one, and this Court should reach the same result here.

**PARTIES**

13.     Plaintiff Leslie Moore is a United States citizen residing in Bangor, Pennsylvania, and during the Relevant Time Period he was a participant in the Plan under 29 U.S.C. § 1002(7).  During the Relevant Time Period, Moore maintained an investment through the Plan in the T. Rowe Price 2035 Target Date Retirement Active Trust ("Target Retirement Trust").

14.     Snap-on, Inc. is a corporation organized and existing under the laws of the State of Delaware.  Snap-on's principal place of business is located in Kenosha, Wisconsin.

15.     Snap-on Incorporation Retirement Plans Committee is an organization within Snap-on, and is controlled and directed by Snap-on.  The Committee maintains its address at Snap-on, Inc.'s principal place of business in Kenosha, Wisconsin.

16.     Mercer (US) LLC was incorporated, and is existing, under the laws of the State of Delaware.  Mercer's principal place of business is located in New York, New York.

17.     Defendants regularly conduct and transact business throughout the United States, including in the State of Pennsylvania, where Moore resides and was employed by Snap-on.

**JURISDICTION & VENUE**

18.     Subject matter jurisdiction over this matter is conferred upon and vested in this Court under 28 U.S.C. §§ 1331 and 1332.

19.     This Court has personal jurisdiction over Defendants because Defendants regularly conduct and transact business within this District.    In

4

particular, Snap-on's contacts with the forum include selling products and employing individuals like Moore, who resided in this District during his employment with Snap-on and continues to do so. Mercer's contacts with the forum include providing services to retirement plans like the Plan, and assuming fiduciary duties with respect to the plan's participants who reside therein.

20. Venue is proper in this Court pursuant to 29 U.S.C. § 1132(e)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District. Further, Defendant Snap-on may be found in this District—it operates several locations in the District, including in Bucks, Delaware, and Chester Counties.

21. This action has been brought within all applicable statutes of limitations and/or repose.

**FACTUAL ALLEGATIONS**

**I.     General Principles of 401(k) Plans.**

22. Defined contribution plans have become the primary form of retirement saving in the United States as employer-provided defined benefit plans, such as pensions, have become increasingly rare.

23. Defined contribution plans do not offer a guaranteed benefit and as a result participants bear the risk of high fees and investment underperformance.

24. Participants each have an individual account, where their own contributions and those made on their behalf by their employer, are allocated.

25. Participants are then free to make investments from a selection of options (the "menu") chosen by the Plan Administrator, who is a named fiduciary for the plan.

26.    A Qualified Default Investment Option ("QDIA") is a default investment choice available to a plan participant who does not specify how to invest their retirement contributions.

27.    QDIAs are selected by plan fiduciaries and automatically receive contributions if participants do not make investment choices; typically, a substantial portion of Plan assets is invested in the QDIA.

28.    Plan fiduciaries are responsible for the prudent selection and continuous monitoring of each option on the menu, including the QDIA.

**II.    The Plan and its Fiduciaries.**

29.    Snap-on is a global developer, manufacturer, and marketer of tool and equipment solutions for professional tool users that employees around 12,600 people worldwide.

30.    Snap-on offers its employees the chance to participate in and contribute their wages to a defined contribution retirement plan called the Snap-on Incorporated 401(k) Savings Plan.  Snap-on is the Plan's sponsor, and the Plan Agreement names it as a fiduciary of the Plan.

31.    At the end of 2024, the plan had 9,632 participants and beneficiaries and cumulative assets available for benefits of $983,243,582.

32.    Snap-on appointed the Committee as Plan Administrator, and the Plan Agreement names the Committee as a fiduciary of the Plan.[1]

---

[1] *See* Snap-On Inc. 401(k) Savings Plan, Plan Agreement, Section 15.3.

33.     Among other things, the Plan Administrator is responsible for "establish[ing] and review[ing] a funding policy which focuses on the Investment Funds offered under the Plan" and "oversee[ing] the investment of Plan … and to contract with one or more investment managers for the benefit of the Plan."[2]

34.     Upon information and belief, the Plan Administrator has never adopted a formal investment policy statement or funding policy.

35.     The Committee is also responsible for "monitor[ing] the performance and fees of the Plan's investments, including remove[ing]/replacing investment funds (as needed)."[3]

36.     In addition to the Committee, Snap-on has engaged an investment advisor, Mercer, since 2011 to "[a]ssist the Committee in the overall supervision of the Plan's investment funds", "[e]valuate the Plan's investment program and monitor plan investment performance/fees on an ongoing basis", "[a]ssist the Committee with investment objectives and plan structure, as appropriate", "[o]ffer guidance and recommendations to the Committee in the selection, retention and removal of investment options", and "[k]eep the Committee informed on current investment or capital market-related trends and issues."[4]

37.     Mercer is an ERISA §3(21) co-fiduciary advisor.  In other words, Mercer's role is to make prudent recommendations to the Committee in line with its fiduciary duties, while the Committee makes the final investment decisions.

---

[2] *Id*. at 15.4.
[3] Snap-On Inc. 401(k) Savings Plan, Investment Monitoring Process ("IMP").
[4] *Id*.

38.     According to the Plan's Investment Monitoring Process (IMP), which upon information and belief was designed and written by Mercer specifically for the Plan's use, the Committee works directly with Mercer "to develop and/or review and approve investment recommendations covering broad investment decisions."

39.     The IMP tasks the Committee with "[m]onitor[ing] the performance and fees of the Plan's investments, including remove/replacing [*sic*] investment funds (as needed)."

40.     The IMP tasks Mercer with "monitor[ing] plan investment performance/fees on an ongoing basis."

41.     As part of Mercer's review process, the IMP requires Mercer to provide the Committee with quarterly monitoring reports on the Committee's options for participants and beneficiaries of the Plan.

42.     The IMP also requires the Committee to "monitor qualified investment managers and other service providers for the Plan."

43.     Defendant Snap-on has filed as an exhibit in this Action records of quarterly payments to Mercer.  (D.E. 38-3).  Over the Relevant Time Period, Mercer was paid approximately $150,000.  *Id.*  Each payment is accompanied by Snap-on's Retirement Plans Manager's signed "understand[ing] and acknowledg[ment] that" Mercer was being paid using "an asset of the Plan." *Id.*

44.     Under ERISA § 104(b)(4), 29 U.S.C. § 1024(b)(4), Plaintiff requested access to certain key documents under which the Plan was established and/or operated.  Snap-on denied Plaintiff access to Mercer's service agreements, meeting

8

minutes and quarterly monitoring reports, and told Plaintiff that Defendants did not create an investment policy for the Plan, despite the Plan's funding policy requiring written investment guidelines.

### III.    Fiduciary Duties Under ERISA.

45.    ERISA imposes strict obligations on fiduciaries, including the duty of prudence, the duty of loyalty, the duty to adhere to plan documents, and the requirement to refrain from any prohibited transactions.  These obligations apply to all fiduciary acts, including the monitoring, and retention of investment options for the Plan.

46.    ERISA's duty of prudence requires fiduciaries to discharge their responsibilities "with the care, skill, prudence, and diligence" that a prudent person "acting in a like capacity and familiar with such matters would use."  ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).  Even in a defined contribution plan in which participants choose their investments, plan fiduciaries have the duty to rigorously and independently evaluate each of the plan's investment choices to determine which may be prudently included in the plan's menu of options.

47.    As part of their fiduciary duties, fiduciaries have "a continuing duty to monitor [ ] investments and remove imprudent ones" that exists "separate and apart from the [fiduciaries'] duty to exercise prudence in selecting investments." *Tibble v. Edison Int'l*, 575 U.S. 523, 529 (2015).

48.    Defendants Snap-on and the Committee breached their fiduciary duties to the Plan by failing to monitor and remove certain JPMorgan and T. Rowe Price

9

investment options in the Plan for over a decade despite their underperformance and excessive expenses.

49.    Defendant Mercer likewise breached its fiduciary duties to the Plan by failing to monitor and recommend removal of those same underperforming and needlessly expensive investment options.

50.    ERISA fiduciaries who are empowered to appoint and remove other plan fiduciaries have the duty to monitor them, to ensure that their appointees' performance is in compliance with the terms of the plan and statutory standards, and otherwise satisfies the needs of the plan.

51.    Under ERISA § 405(a), 29 U.S.C. § 1105(a), a fiduciary may also breach his duties to the Plan if (1) he participates knowingly in, or knowingly undertakes to conceal, an act or omission of another fiduciary, knowing that such act or omission is a breach; (2) his breach of duty enables another fiduciary to commit a breach; or (3) he has knowledge of another fiduciary's breach and does not make reasonable efforts under the circumstances to remedy the breach.

52.    By failing to notice or appreciate that the Committee and/or Mercer had not conducted *their* duties to monitor the performance and costs of the Plan's investments, Snap-on has breached *its* duty to monitor its appointees.

53.    Alternatively, by knowing that the Committee and/or Mercer had not conducted their duties to monitor the performance and costs of the Plan's investments, Snap-on is liable for their breaches of duty.

54.     The general duties of loyalty and prudence imposed by ERISA § 404, 29 U.S.C. § 1104, are supplemented by a detailed list of transactions that are expressly prohibited by ERISA § 406, 29 U.S.C. § 1106, and are considered *per se* violations because they entail a high potential for abuse.

55.     ERISA § 406(a)(1), 29 U.S.C. § 1106(a)(1), states that with respect to a plan, a fiduciary "shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . (C) furnishing of goods, services, or facilities between the plan and a party in interest; [or a] (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan[.]"

56.     ERISA § 3(14), 29 U.S.C. § 1002(14), provides an expansive definition of "party in interest."  This term includes the Plan's fiduciaries, as well as certain non-fiduciaries who nevertheless by virtue of their relationship to the Plan should not receive any of its assets, or other compensation through use of the assets of the Plan.

57.     Defendant Snap-on also breached its fiduciary duties to the Plan by engaging in a prohibited transaction by directing Mercer's compensation to be taken from Plan assets during the Relevant Time Period.

**IV.     The Underperforming Funds.**

58.     There are two investment options on the Plan's menu that best illustrate Defendants' abdication of their responsibilities under ERISA: the JPMorgan U.S. Equity Fund, which at different points in the Relevant Time Period was offered as a mutual fund and as a Collective Investment Trust (CIT), and the T. Rowe Price Target Retirement Trusts, offered throughout the Relevant Time Period

as CITs.  Collectively, Plaintiff refers to these challenged investment vehicles as the "Funds."

59.    CITs are very similar to mutual funds.[5]  In fact, many mutual funds have CIT counterparts, that are nearly identical with respect to their underlying holdings and performance.  CITs and their mutual fund counterparts are also typically managed by the same managers, and employ the same objectives, strategies, and risk profiles.  The key quantitative difference for investors between CITs and their mutual fund counterparts is that CITs tend to offer slightly lower fees, and therefore their net returns tend to be slightly higher.

60.    Despite these similarities, CITs and mutual funds are subject to very different regulatory systems.  To briefly summarize a large body of literature, CITs are a relatively new investment vehicle and are subject to less regulation than traditional mutual funds are.  For example, CITs are not required to publish their returns, expenses, or other key information which mutual funds are required by the SEC to provide.[6]  CITs are also only available to qualified institutional investors such as retirement plans; they are not available to individual retail investors.

---

[5] For this reason, and for ease of reading, Plaintiff herein refers generally to investment vehicles (including both CITs and mutual funds) as "funds" unless the differences between a mutual fund and a CIT are relevant in that context.

[6] This led SEC Chair Gary Gensler to infamously describe a hypothetical market run on a CIT as a "bear in the woods": faced with impending illiquidity, an investor need only outrun his fellow investors to preserve his investment, while the slow-to-act will face the "bear" of diluted, illiquid assets.  Mutual funds are subject to redemption rules and other regulations designed to limit the occurrence of market runs and resulting liquidity problems.

61.    Due to the lack of mandated transparency for CITs, performance data is not regularly published in mandatory annual reports, and typically such information is not freely shared beyond the CITs' investors (such as the Plan).[7] Nevertheless, because many CITs have mutual fund counterparts, and because the holdings and performance of CITs and mutual fund counterparts are statistically nearly identical, a CIT's performance can be demonstrated with great statistical accuracy by the performance of its mutual fund counterpart.

62.    The Funds are actively managed.  In other words, managers make changes to the Funds' allocations of stocks, bonds, and cash over time, with the stated goal of outperforming a "benchmark," which is generally an index of market performance measuring the performance of stocks in the S&P 500, Russell 1000, etc.[8] These "active" funds are sometimes contrasted with "passive" index funds, which seek to track a market index as closely as possible by investing in the index's investments, and involve little discretion on the part of the fund's managers.

63.    Every actively-managed mutual fund regulated by the SEC is required to set a benchmark, and to disclose to its shareholders in its annual and semi-annual

---

[7] For example, to access information regarding the T. Rowe Price Target Retirement Trusts, one must register for an account on T. Rowe Price's website using an e-mail address "associated with a financial firm[.]" *CIT Offerings*, T. ROWE PRICE, https://www.troweprice.com/financial-intermediary/us/en/investments/collective-investment-trusts.html (last visited May 27, 2026).

[8] *See* Ashley Kilroy, *What Is Active Management and Is It Right For You?*, SmartAsset Advisor, LLC (February 16, 2023), https://smartasset.com/financial-advisor/active-management ("[t]he goal of active management is to outperform a specific market index or, in a market downturn, to book losses that are less severe than a specific market index suffers").

reports how the fund performed in relation to that benchmark. If the mutual fund decides to switch to a different benchmark, it must provide an explanation for the change to its shareholders, and provide them with data showing the relative performance of the old and new benchmarks. CITs are not subject to these requirements, but the Target Retirement Trusts and the JPMorgan U.S. Equity Fund CIT have still designated benchmarks.

64. Nearly every active fund charges investors a fee in exchange for its managers' efforts to beat the designated benchmark. Generally, this fee is a percentage of the assets under management, known as the "expense ratio." This fee is deducted from investment returns daily. The expense ratios of active funds are generally higher than those of passive funds.

65. Because retirement funds are normally a long-term investment, very small differences in an investment's return or costs can have surprisingly large impacts when compounded for decades. For example, the U.S. Department of Labor estimates that just a 1% dip in the growth rate of an investment (or the imposition of an additional 1% in fees), compounded over a 35-year period, results in a 28% reduction in retirement assets when a participant retires.[9] For example, if a participant invested $100,000 at Year 0 and made no further contributions, assuming a consistent 7% annual growth rate, 35 years later, the assets would be worth $1,067,658.15. If that growth rate were dragged down to 6%, whether by the

---

[9] *A Look at 401(k) Plan Fees*, U.S. Dep't. of Labor, (Sept. 2019) at 1–2, https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/ouractivities/resourcecenter/publications/a-look-at-401k-plan-fees.pdf.

imposition of an additional 1% in fees or by underperformance, the participant would be left with only $768,608.68 (almost exactly 28% less).

66.    Thus, prudent fiduciaries cannot disregard even small differences in the growth rate of certain funds compared to their indices, or in the expense ratios of one fund versus another—fractions of a percent today can grow or shrink the Plan's assets by millions or tens of millions of dollars tomorrow.

67.    Many funds, including the Target Date Trusts, offer multiple "share classes."[10] Share classes in a single fund are targeted at different investors. These share classes generally hold the same components, use the same managers, and follow the same investment objectives and policies. The key difference between them is in the amount and structure of their fees and expenses, which typically depend on the amount of money a given plan has available to invest: larger accounts and those making longer-term investments are incentivized to invest in a fund through lower-cost share classes.[11]

68.    The most common type of fund share classes, known as "A shares," require an up-front payment (the "front-end load") at purchase. "B shares" are the opposite: they have no up-front cost, but carry a "back-end load," which is a commission paid when the share is sold. Typically, this commission decreases the

---

[10] Technically, for a CIT, the proper term is "trust class." Because there is no practical difference between how trust classes and share classes operate, Plaintiff will use the term "share class" to describe both for ease of reading.

[11] In other scenarios not applicable here, share classes have other differences. For example, share classes of a stock in an individual company may come with different attendant rights and voting power with respect to shareholder votes.

longer the share is held, and can reach zero given enough time. "C shares" have no front-end or back-end load, but instead a "level load" that is simply a smaller annual percentage of the assets under management throughout the life of the investment. Typically, for retail investors, "A shares" present the lowest lifetime costs for long-term investments.

69.    Institutional investors, such as 401(k) plans, have access to an exclusive tier of share class: "Institutional" shares, which are variably labeled with the letters I, R, N, X, or Y. These share classes typically offer the lowest expense ratios available, carry no up-front cost or back-end commission at sale, and "invariably garner the best returns."[12]

70.    Morningstar assigns every fund an "equity style," which reflects the fund's placement in a 3 x 3 grid called the "style box." The Y axis of the style box denotes the average size of the fund's holdings (large, mid-, or small-capitalization stocks), while the X axis denotes whether the holdings tend towards investing in value stocks, growth stocks, or a blend thereof.

71.    Value stocks are shares of a company that appear to be trading for less than their worth. A growth stock is a stock of a company that is anticipated to grow at a rate above market growth.

---

[12] Troy Segal, *Understanding Share Classes: Types, Rights, and Key Features Explained*, INVESTOPEDIA (Oct. 3, 2025), https://www.investopedia.com/terms/s/share_class.asp.

### A.    JPMorgan U.S. Equity Fund.

72.    The JPMorgan U.S. Equity Fund was originally added to the Plan's menu in 2015 through a mutual fund structure.

73.    In 2023, the Plan shifted its assets in the JPMorgan U.S. Equity Fund mutual fund into its CIT counterpart.

74.    The JPMorgan U.S. Equity Fund CIT remained in the Plan until 2025.

75.    The JPMorgan U.S. Equity Fund's mutual fund and CIT versions are both focused on long-term capital growth by investing a mix of stocks.

76.    The JPMorgan U.S. Equity Fund mutual fund designates the S&P 500 as its benchmark in its prospectus and annual shareholder reports.

77.    The JPMorgan U.S. Equity Fund CIT is not required by the SEC to designate a benchmark.  Still, like its mutual fund counterpart, it designates the S&P 500 as its benchmark.

78.    In recent years, the JPMorgan U.S. Equity Fund has undergone "style drift," wherein its holdings have remained in the large-cap category, but have shifted between the growth and blend categories.  Thus, it is appropriate to also judge its performance against a growth-oriented large-cap index, such as the Russell 1000 Growth Index.

79.    The mutual fund and CIT versions of the JPMorgan U.S. Equity Fund hold nearly-identical holdings (generally, mutual fund and CIT counterparts of the same holdings, respectively), and they also offer performance that is statistically nearly-identical.  In short, the JPMorgan U.S. Equity Fund's CIT is functionally identical to its mutual fund counterpart.

17

80.     For this reason, where direct performance data is not publicly available, the performance of the JPMorgan U.S. Equity Trust is given by reference to the performance of the JPMorgan U.S. Equity Fund over the same period.

### B.     T. Rowe Price Target Retirement Trusts.

81.     The T. Rowe Price Target Retirement Trusts were added to the Plan in 2015 as investment options.[13]

82.     The T. Rowe Price Target Retirement Trusts remain available as current investment options in the Plan.

83.     A Target Retirement Trust is similar to a target date mutual fund, in that it is a "trust of trusts," or a trust that focuses on purchasing shares in other CITs rather than individual securities.  Moreover, a Target Retirement Trust also offers a comprehensive retirement plan by investing in a mix of other trusts that become more conservative as the projected retirement year approaches.

84.     The T. Rowe Price Target Retirement Trusts serve as QDIAs in the Plan.  In other words, if participants do not elect a specific fund to allocate their contributions to, they will automatically be invested in the T. Rowe Price Target Retirement Trusts.

---

[13] At the time that Defendants began including T. Rowe Price's Target Retirement Trusts these trusts were named, *inter alia*, "T. Rowe Price Retirement 2015 Active Trust."  However, in 2016, T. Rowe Price announced that it would no longer include the word "Active" in the title of these trusts.  Despite this change, from 2016 to 2024, Snap-on continued to call the funds "Active" on its Form 5500s.

85.    T. Rowe Price's Target Retirement Trusts include a variety of other T. Rowe Price trusts.  For example, the top ten holdings in the T. Rowe Price 2035 Target Retirement Trust on March 31, 2026 were:

## T. Rowe Price Retirement 2035 Trust

Target-Date 2035 | Class F

**Ten largest holdings**

| | | |
|---|---|---|
| 1 | T. Rowe Price U.S. Value Equity Tr-Z | |
| 2 | T. Rowe Price Growth Stock Tr-Z | |
| 3 | T. Rowe Price Bond Tr I-T4 | |
| 4 | T. Rowe Price U.S. Large-Cap Core Tr-Z | |
| 5 | T. Rowe Price Equity Index Tr-Z | |
| 6 | T. Rowe Price International Val Eq Tr-Z | |
| 7 | T. Rowe Price International Core Eq Tr-Z | |
| 8 | T. Rowe Price International Gr Eq Tr-Z | |
| 9 | T. Rowe Price Real Assets Tr I-Z | |
| 10 | T. Rowe Price International Bond Tr-Z | |
| Top 10 as % of total net assets | | 75.0% |

86.    The largest holding in the 2035 Target Retirement Trust is the T. Rowe Price Value Equity Trust-Z ("Value Trust"), which is a large-cap value equity trust.[14]

87.    The Value Trust is one of the ten largest holdings in each Target Retirement Trust "vintage," including the trusts targeting retirement dates in or around 2005, 2010, 2015, 2020, 2025, 2030, 2035, 2040, 2045, 2050, 2055, 2060, and 2065.

88.    Upon information and belief, the reason that the T. Rowe Price Target Retirement Trusts are composed of such large percentages of the Value Trust is to

---

[14] Large-cap refers to stocks in companies with market capitalization of over $10 billion.  An equity trust is a form of CIT that invests in stocks or equities.

increase the Value Trust's own profits, as the assets in the Value Trust have decreased sharply since 2019. In 2019, the Value Trust had $16,995,000 invested, whereas in 2024 the Value Trust had only $3,376,000 invested. The more money invested in a CIT, the higher the fees, and thus income, for T. Rowe Price

89. The Value Fund consisted of 49% of "value" stocks from 2013 to 2018 and 51% of blend and growth stocks.[15]

90. At no time in the past five years has the Value Trust had more than 50% of value stocks.

91. The Target Retirement Trusts are not required to set a benchmark because they are not regulated by the SEC. Still, the Target Retirement Trusts' managers have designated as a benchmark for each Target Date the respective S&P Target Date Trust (*e.g.*, for the Target Date 2030 Trust, the benchmark is the S&P Target Date 2030 Trust).

92. The Value Trust is also not required to set a benchmark because it is not regulated by the SEC. Still, the Value Trust's managers have designated the Russell 3000 as its benchmark.

93. The Target Retirement Trusts (regardless of the specific target date) are offered through several share classes, of varying expense ratios. Defendants Snap-on and the Committee have selected share class F, which has an expense ratio of

---

[15] Despite its name, the Value Trust at no time during the Relevant Time Period contained more "value" stocks than "growth" and "blend" stocks.

0.37%.    Defendant Mercer either recommended that share class, or did not recommend a different share class.

94.    Today, share class F is the second-most expensive share class offered among fifteen share classes.  As of 2017, when share class F was first made available it was also the second-most expensive share class offered.  The lowest-price share class offered had an expense ratio of only 0.30%.

95.    During the Relevant Time Period, the Target Retirement Trusts have added eight new share classes, each with significantly lower expense ratios than class F.  In 2020, the H class was added, with an expense ratio of 0.28%.  In 2021, the J class was added, with an expense ratio of 0.27%.  In 2022, the K class was added, with an expense ratio of 0.26%.  In the last year, four more share classes have been added, each with cheaper expense ratios as low as 0.24%.  Apart from the price difference, each of these cheaper share classes is otherwise identical in terms of its holdings, management, and risk, to the F class.

96.    Target Retirement Trust's holdings are largely other CITs, which in turn hold individual securities.  The Target Retirement Trusts' target date mutual fund counterparts hold mutual fund counterparts of the same underlying CITs, which in turn hold the same individual securities as the CITs.  In fact, the top ten holdings of the T. Rowe Price 2035 Retirement Mutual Fund nearly mirrors the trust holdings of the 2035 Target Retirement Trust with their mutual fund counterparts:

**Top 10 Holdings**                                      | Monthly | **Quarterly** |

Represents 74.56% of Total Net Assets                    Quarterly (as of 3/31/2026)

| TRP Value - Z | 12.87% | TRP International Value Equity - Z | 6.59% |
| TRP Growth Stock - Z | 11.50% | TRP Overseas Stock - Z | 6.36% |
| TRP New Income - Z | 9.96% | TRP International Stock - Z | 5.04% |
| TRP Equity Index 500 - Z | 6.89% | TRP Real Assets - Z | 4.87% |
| TRP US Large-Cap Core - Z | 6.77% | TRP International Bd (USD Hedged) - Z | 3.71% |

97.    The performance of the CIT holdings of the Target Retirement Trusts—and the performance of the mutual fund holdings of their target date mutual fund counterparts—correlate nearly perfectly based on widely-accepted statistical methods.  The Target Retirement Trusts and their mutual fund counterparts also share the same managers.  T. Rowe Price has further remarked in a white paper that its "CITs use the same investment strategies as their mutual fund counterparts."

98.    In short, the Target Retirement Trusts are functionally identical to their target date mutual fund counterparts, and the Value Trust is functionally identical to the T. Rowe Price Value Equity Fund.

99.    For this reason, where direct performance data is not publicly available, the performance of the Target Retirement Trusts is alleged by reference to the performance of the T. Rowe Price Target Date Retirement Mutual Funds over the same period, and the performance of the T. Rowe Price Value Equity Trust is alleged

by reference to the performance of the T. Rowe Price Value Equity Fund over the same period.

### V. Defendants Failed to Monitor the Investment Options on the Plan's Menu and Remove Imprudent Ones.

100. Defendants Snap-on and the Committee breached their fiduciary duties to the Plaintiff and the Plan's participants by failing to monitor the investment options in the Plan's portfolio, as evidenced by (1) their retention of the JPMorgan U.S. Equity Fund and T. Rowe Price Target Retirement Trusts as Plan investment options despite the Funds' consistent underperformance and excessive volatility over the past decade; and (2) their failure to shift the Target Retirement Trust assets into a cheaper share class, and retention of the second-most expensive share class for the past decade.

101. Defendant Mercer breached its fiduciary duties to the Plaintiff and the Plan's participants by failing to monitor the investment options in the Plan's portfolio, as evidenced by (1) its failure to recommend the removal of the JPMorgan U.S. Equity Fund and T. Rowe Price Target Retirement Trusts as Plan investment options despite the Funds' consistent underperformance and excessive volatility over the past decade; and (2) its failure to recommend that the Plan shift the Target Retirement Trust assts into a cheaper share class.

102. Defendants also breached their fiduciary duties to the Plaintiff and the Plan's participants by utilizing a fundamentally deficient process to evaluate the performance and costs of the investments on the Plan's menu that misused investment data in a manner contrary to the data publisher's clear instructions.

23

103.    Avoiding or rectifying the process failures detailed herein and/or to be proven at trial did not require any specialized financial training, nor even particular intelligence or insightfulness, on the part of Defendants.  Defendants' failure to notice or remedy their failures over a several-year period reflects the complete abdication of their fiduciary responsibilities to the Plan.

**A.    Throughout the Last Decade, the Funds Underperformed Their Benchmarks, Displayed Excessive Volatility and Turnover, and Yet Defendants Retained Them.**

104.    Market research has shown that investors should be cautious about certain actively managed investments' ability to consistently beat their benchmarks, which is a major concern for long-term retirement savers, including Plan participants and beneficiaries.

105.    Although they may find success over short timeframes, active investment managers rarely manage to time their trades well enough to beat the market.

106.    This means that retirement plan fiduciaries must carefully analyze each active investment's ability to provide value and, if the investment does not, replace it with an active or passive investment that has demonstrated such capabilities.

107.    In particular, where an active fund's benchmark also has one or more passive index funds tracking it—*i.e.*, funds that simply track the benchmark's holdings with limited management and very low costs—the managed fund's repeated failure to beat the benchmark demonstrates that the index fund(s) would provide better returns for the plan at lower cost.

108. Underperformance over a three- or five-year period is a cause for concern and scrutiny and can itself be a reason to remove an investment from a plan.

109. Underperformance over several consecutive three- or five-year trailing periods is cause for both alarm and action.

110. In measuring a given fund's performance and risk, plan fiduciaries consider several metrics, including the fund's "alpha," "information ratio," and "turnover rate."

111. These metrics are publicly reported, or able to be determined by applying widely-accepted mathematical formulas to publicly reported data. Where metrics are not available (i.e., for a CIT), the same metrics of the CIT's mutual fund counterpart are publicly available.

112. The performance of a fund against its benchmark is measured by the "alpha" figure, which reflects the difference in return percentage compared to the benchmark. When a fund's alpha is positive, it generated more returns than the benchmark; when it is negative, it underperformed. An alpha of zero indicates an identical return compared to the benchmark.

113. The "information ratio" measures return versus risk in a given fund. To calculate the Information Ratio, the average difference in return compared to the benchmark is divided by the volatility of that return (which is represented by the standard deviation of the average). Specifically, the ratio measures how consistently a fund delivers an excess return compared to a benchmark fund.

114. For example, if a fund has an average return of 2% more than its benchmark over a given period, and the standard deviation of the fund's average return relative to the benchmark is 4%, then the information ratio over the period in question would be 0.5.

115. A 0.5 information ratio is generally the minimum acceptable to investors and responsible plan fiduciaries. An information ratio of 1.0 or higher is ideal because it signals that the level of volatility in the fund is balanced against its performance in comparison to the benchmark.[16]

116. A negative information ratio suggests that the benchmark may be a better investment, because it implies a negative average alpha.

117. The "turnover rate" of a fund indicates how long it holds onto its stocks after purchasing them. A higher rate suggests the fund frequently sells stocks it bought earlier in the year, which can indicate that the portfolio manager's strategies are shifting or inconsistent with a long-term approach.

118. A fund with a long-term strategy typically holds onto about 80% of the stocks it purchases within a calendar year, resulting in a turnover rate of around 20%. A turnover rate of 30% or more is considered problematic.

---

[16] *See* Robert Selouan, CAIA, CFA, *The power of information ratio (IR) in active management*, State Street Investment Management (March 2, 2026), https://www.ssga.com/us/en/intermediary/insights/the-power-of-information-ratio-ir-in-active-management ("Information ratios above 0.5 are often viewed as reflecting solid skill, while values above 1.0 are often seen as indicating strong, consistent value added")

119.    The U.S. Securities and Exchange Commission (SEC) estimates that a 50% turnover can increase an investor's annual trading costs by 0.5% to 1% and decrease their yearly returns by 10% to 20%.

120.    Underperformance can cost Plan participants thousands or hundreds of thousands of dollars in retirement funds.  For example, if the mean Plan participant (with an account balance of $106,163) would normally have an annual return of 5%, just a 0.5% decrease to the growth rate would cost him $3,195.47 in lost growth over five years.

121.    According to the Plan's Investment Monitoring Process (IMP), the Committee and Mercer evaluate the performance and costs of the Plan's investment options on a quarterly basis.

122.    According to the IMP, each of Mercer's and/or the Committee's reviews and reports analyzes the performance of the investments on the menu during the three- and five-year period before each Committee meeting and Plan investment review.

123.    Specifically, the IMP requires that Mercer and/or the Committee monitor "[p]erformance (return/risk) relative to the index (benchmark) over rolling 3 & 5 year periods (market cycle)" and "[p]erformance (return/risk) relative to the index (benchmark) over rolling 3 & 5 year periods[.]"  In other words, Mercer and the Committee must—at minimum—consider the three- and five-year alphas and

information ratios of the Funds compared to their benchmarks at each quarterly meeting.[17]

124.    The IMP provides that "[s]hould an investment option underperform for a sustained period of time or should some other material change, or concern arise as to its appropriateness to continue as an investment option, the Committee may take any of the following actions at any time: Place the investment on a 'watch list' before additional actions are taken with respect to the investment option; Supplement the investment option with one or more alternative investment option(s); Replace the investment option with one or more alternative investment option(s); Eliminate the investment option."

125.    The IMP provides that "[o]n a quarterly basis, investment fees are reviewed for reasonableness[.]" Specifically, it mentions that "[o]pportunities to reduce fees for participants are part of an on-going evaluation.  Mercer will monitor for lower cost share class or investment vehicles (as the Plan qualifies) and provide recommendations to the Committee."

126.    Based on this analysis, the IMP provides that Mercer "[o]ffer[s] guidance and recommendations to the Committee in the selection, retention, and removal of investment options" on the Plan's menu.

---

[17] The IMP also states that the Committee and Mercer will compare the investments to peer groups.  Such peer group comparisons are made using overbroad peer groups that result in overestimating returns and underestimating risk.  The publisher of widely-used peer data provides clear instructions on how to avoid this pitfall.

127.    The IMP provides that "[s]hould an investment option underperform for a sustained period of time or should some other material change, or concern arise … the Committee may" supplement, replace, or eliminate the investment.

### 1.    Throughout the Last Decade, the JPMorgan U.S. Equity Fund Significantly Underperformed, Was Excessively Volatile, and Had Excessive Turnover.

128.    Throughout the Relevant Time Period, and in the period Defendants would have considered when evaluating the JPMorgan U.S. Equity Fund at the beginning of the Relevant Time Period, the JPMorgan U.S. Equity Fund was raising clear red flags for any fiduciary who cared to look.

129.    For example, at the beginning of the Relevant Time Period (2020), the JPMorgan U.S. Equity Fund had a ten-year average alpha of -0.09 against the S&P 500—that is, it underperformed the S&P 500 by an average of nine basis points over a ten-year period.

130.    In 2019, the three-year and five-year average alphas of the JPMorgan U.S. Equity Fund against the S&P 500 were both negative, trailing the S&P 500 by 0.27 and 0.47%, respectively.

131.    Since 2021, the three-year alpha of the JPMorgan U.S. Equity Fund against the S&P 500 has worsened every single year.

132.    Since 2021, the ten-year alpha of the JPMorgan U.S. Equity Fund against the S&P 500 has worsened every single year.

133.    In 2020, the five-year and ten-year information ratios were 0.32 and 0.25, respectively, both far below the industry-accepted minimum of 0.5. The three-year information ratio barely met the threshold, at 0.50 even.

29

134.    Every year since 2020, the ten-year information ratio of the J.P. Morgan U.S. Equity Fund against the S&P 500 has fallen below the 0.5 threshold. It has further declined every year since 2021.

135.    Only once *since 2014* has the JPMorgan U.S. Equity Fund's five-year information ratio against the S&P 500 exceeded 0.5, and in three years the five-year information ratio was negative.

136.    Only five times *since 2012* has the JPMorgan U.S. Equity Fund's three-year information ratio exceeded 0.5, and in seven of those years the three-year information ratio was negative.

137.    Even these concerning results paint an unrealistically *positive* picture of the fund's performance because they are skewed by abnormally strong returns in 2020, amidst the market chaos of the COVID-19 pandemic. Considering only 2010–2019 and 2021–2025, the three-year, five-year, and ten-year alphas become even more overwhelmingly negative. The five-year and ten-year information ratios never reach the 0.5 threshold once. The three-year information ratio exceeds 0.5 only three times since 2012. It is clear that 2020 was a fluke, more likely driven by luck than by a sudden—and short-lived—improvement in the skill of the fund's managers.

138.    There are many index funds that track the S&P 500 index, *e.g.*, the iShares S&P 500 ETF. The iShares S&P 500 ETF has been available since 2000, and has an expense ratio of only 0.04%. The Plan has qualified to invest in the iShares S&P 500 ETF for the entire Relevant Time Period.

30

139.   Because the JPMorgan U.S. Equity Fund underperformed the S&P 500 index throughout the Relevant Time Period, had Snap-on invested (or had Mercer recommended investing) in the iShares S&P 500 ETF or a similar index fund tracking the S&P 500, the Plan's returns would have been greater, and its expenses would have been lower during that period as well, yielding a significantly greater overall return.

140.   Comparing the JPMorgan U.S. Equity Fund to the Russell 1000 Growth Index, which matches the fund's growth focus, the red flags are even more glaring.

141.   When the Defendants conducted their first quarterly reviews during the Relevant Time Period in 2020, the JPMorgan U.S. Equity Fund's metrics were red across the board against the Russell 1000 Growth: its three-year, five-year, and ten-year average alphas were all significantly negative, lagging the Russell 1000 Growth by averages of 6.74%, 4.98%, and 2.78%, respectively.

142.   Since 2020, these three-, five-, and ten-year average alphas have continued their negative trend.  The three-year alphas slightly improved in 2022 and 2023, driven by outlier performance in 2021.  Still, these best results were negative.

143.   Likewise, in 2020 the fund's three-, five-, and ten-year information ratios against the Russell 1000 Growth were negative, a far cry from the (positive) 0.5 minimum.

144.   Since 2020, these three-, five-, and ten-year information ratios have *never once* hit the 0.5 threshold.

145.    There are many index funds that track the Russell 1000 Growth index, *e.g.*, the Vanguard Russell 1000 Growth Index Fund ETF.  The Vanguard Russell 1000 Growth Index Fund ETF has been available since 2010, and has an expense ratio of only 0.06%.  The Plan has qualified to invest in the Vanguard Russell 1000 Growth Index Fund ETF for the entire Relevant Time Period.

146.    Because the JPMorgan U.S. Equity Fund underperformed the Russell 1000 Growth index throughout the Relevant Time Period, had Snap-on invested (or had Mercer recommended investing) in the Vanguard Russell 1000 Growth Index Fund ETF or a similar index fund tracking the Russell 1000 Growth, the Plan's returns would have been significantly greater, and its expenses would have been lower during that period as well, yielding a significantly greater overall return.

147.    The JPMorgan U.S. Equity Fund's prospectus emphasizes long-term capital growth as its main goal by investing in undervalued large-cap stocks.

148.    Despite this stated long-term strategy, the JPMorgan U.S. Equity Fund had an average turnover rate of 64% during each plan year from 2020 to 2024, even higher than the turnover rate the SEC predicted could decrease investors' yearly returns by 10% to 20%.

149.    The Plan's IMP states that Mercer and the Committee will monitor the investments on the menu quarterly, incorporating an evaluation of each investment's performance against its benchmark and the investment's risk.

150.    The foregoing red flags are publicly reported, or able to be determined by applying widely-accepted formulas to publicly reported data.

151. Had Defendants prudently reviewed the JPMorgan U.S. Equity Fund as required by the IMP prior to 2025, they would have observed its consistent underperformance against its own stated benchmark and a similar, growth-oriented benchmark. A prudent fiduciary in Snap-on's position would have removed the JPMorgan U.S. Equity Fund from the Plan; a prudent fiduciary in Mercer's position would have recommended its removal.

152. The JPMorgan U.S. Equity Fund's survival on the Plan menu through 2022 as a mutual fund and through 2025 as a CIT, despite these long-present, glaring red flags evidences a deficient investment monitoring process: these signs of underperformance were either missed, misunderstood, or intentionally disregarded by the Plan's fiduciaries during dozens of consecutive quarterly reviews, or the quarterly reviews did not actually occur as required by the IMP. In other words, even to the extent that following the processes and procedures in the IMP would have been sufficient for Defendants to comply with their fiduciary and other legal obligations, Defendants simply did not follow them.

  **2. Throughout the Last Decade, the Value Trust—A Large Holding of the Target Retirement Trusts— Significantly Underperformed its Benchmark, Was Excessively Volatile, and Had Excessive Turnover.**

153. Throughout the Relevant Time Period, and in the period Defendants would have considered when evaluating the Target Retirement Trusts at the beginning of the Relevant Time Period, the Value Trust was raising clear red flags for any fiduciary who cared to look.

154. The Value Trust, which makes up a large part of all vintages of T. Rowe Price's Target Retirement Trusts, has consistently and dramatically underperformed its benchmark, the Russell 3000 Index, while the Target Retirement Trusts have been offered as an investment to Plan participants.

155. In 2020, during the first quarterly reviews of the Relevant Time Period, the Value Trust's three-year, five-year, and ten-year alphas were all in the red, lagging behind the Russell 3000 by 6.47%, 4.68%, and 2.10%, respectively. Indeed, at that time, the Value Trust had not beaten the Russell 3000 since 2015.

156. Throughout the Relevant Time Period, these three-, five-, and ten-year alphas continued to show consistent underperformance against the Russell 3000. As of 2025, the three-year alpha was -9.20, reflecting a nearly 10% underperformance compared to the benchmark the fund chose for itself.

157. Furthermore, the volatility of the Value Trust's returns was high throughout the Relevant Time Period and before. The Value Trust's three-year information ratio has not achieved the minimum threshold of 0.5 *since 2014*. Considering the last fifteen years of data, that one year was the only time the Value Trust posted a sufficient information ratio. The Value Trust's five-year and ten-year information ratios are even worse: neither metric has reached the minimum threshold of 0.5 even once, considering the last fifteen years of data.

158. There are many index funds that track the Russell 3000 index, *e.g.*, the Vanguard Russell 3000 Index Fund. The Vanguard Russell 3000 Index Fund has been available since 2010, and has an expense ratio of only 0.05%. The Plan has

qualified to invest in the Vanguard Russell 3000 Index Fund for the entire Relevant Time Period.

159.    Because the Value Trust underperformed the Russell 3000 index throughout the Relevant Time Period, had Defendant Snap-on invested (or Defendant Mercer recommended investing) in the Vanguard Russell 3000 Index Fund or a similar index fund tracking the Russell 3000, the Plan's returns would have been significantly greater, and its expenses would have been significantly lower during that period.

160.    From 2013 to 2024, the Value Trust had a median turnover of 101.5%. In other words, by December 31 of each year, the portfolio manager had sold all of his purchases since January 1 of that year.  This is more than double the turnover rate the SEC predicted could decrease investors' returns by 10 to 20%.

161.    At no point during 2013 to 2024 did the Value Trust's annual turnover fall at or below the recommended 20% threshold.  The lowest annual turnover during this period was 44%.

162.    The Plan's IMP requires that Mercer and the Committee monitor the investments on the menu quarterly, incorporating an evaluation of each investment's performance against its benchmark and the investment's risk.

163.    The foregoing red flags are publicly reported, or able to be determined by applying widely-accepted formulas to publicly reported data.

164.    Had Defendants prudently reviewed the Target Retirement Trusts as stated in the IMP at any point since 2015, they would have observed the Value Trust's

consistent underperformance and excessive risk against its benchmark.  Due to the large proportions of the Target Retirement Trusts' holdings that had been invested in the Value Trust, a prudent fiduciary in Snap-on's position would have removed the Target Retirement Trusts from the Plan.  A prudent fiduciary in Mercer's position would have recommended their removal.

165.    The Target Retirement Trusts' survival on the Plan menu through today despite these long-present, glaring red flags in the Value Trust evidences a deficient investment monitoring process: these signs of underperformance and excessive risk were either missed, misunderstood, or intentionally disregarded by the Plan's fiduciaries during several consecutive quarterly reviews, or the quarterly reviews did not actually occur as required by the IMP.  In other words, even to the extent that following the processes and procedures in the IMP would have been sufficient for Defendants to comply with their fiduciary and other legal obligations, Defendants simply did not follow them.

> **B.    Throughout the Last Decade, the Plan's Assets in the Target Retirement Trusts Have Qualified for Cheaper but Otherwise-Identical Share Classes.  Yet Defendants Have Failed to Seize Nearly $2 Million in Savings for the Plan.**

166.    Snap-on offered Plan participants the Target Retirement Trusts through Share Class F, which is the second-most expensive share class available.

167.    The Plan's participants have invested in Target Retirement Trusts dated for 2005, 2010, 2015, 2020, 2025, 2030, 2035, 2040, 2045, 2050, 2055, 2060, and 2065.  As of Snap-on's 2024 Form 5500, Plan participants had invested $412,035,306 across all target dates of the Target Retirement Trusts.

36

168. Several less expensive but otherwise-identical (*i.e.*, using the same managers, following the same objectives, holding the same components, etc.) share classes of the Target Retirement Trusts were available throughout the Relevant Time Period. The share classes available as of filing, and their respective expense ratios, are provided as an example below. The 2035 target date is used as an example, though the share classes are identical across all target dates.

### Target Retirement Trust Share Class Prices

| Name | Expense % | Available Since |
|---|---|---|
| T. Rowe Price Ret 2035 Tr-A | 0.38 | 2012 |
| T. Rowe Price Ret 2035 Tr-B | 0.36 | 2012 |
| T. Rowe Price Ret 2035 Tr-C | 0.34 | 2013 |
| T. Rowe Price Ret 2035 Tr-D | 0.32 | 2014 |
| T. Rowe Price Ret 2035 Tr-E | 0.30 | 2015 |
| **T. Rowe Price Ret 2035 Tr-F** | **0.37** | **2017** |
| T. Rowe Price Ret 2035 Tr-G | 0.29 | 2018 |
| T. Rowe Price Ret 2035 Tr-H | 0.28 | 2020 |
| T. Rowe Price Ret 2035 Tr-J | 0.27 | 2021 |
| T. Rowe Price Ret 2035 Tr-K | 0.26 | 2022 |
| T. Rowe Price Ret 2035 Tr-SG | 0.25 | 2025 |
| T. Rowe Price Ret 2035 Tr-TC | 0.25 | 2025 |
| T. Rowe Price Ret 2035 Tr-CT | 0.24 | 2025 |
| T. Rowe Price Ret 2035 Tr-MS | 0.27 | 2025 |
| T. Rowe Price Ret 2035 Tr-MM | 0.27 | 2026 |

169. The Plan qualified to invest in significantly cheaper share classes throughout the Relevant Time Period. There is no valid reason that the Plan (or any retirement plan) should invest in a more expensive share class when it qualifies to invest in the cheaper but otherwise-identical share class, and Defendants' decade of inaction evidences a quintessential breach of fiduciary duty.

170. The difference in expense ratio between the F class and the cheaper share classes offered during the Relevant Time Period has stark implications for the Plan's participants. Given the immense sums of the participants' monies that were

invested in the Target Rate Trusts as reported on the Plan's Forms 5500, had Defendants taken advantage of the cheaper share classes as they became available, the savings to the Plan if would have amounted to several hundred thousand dollars every year.  This is examined in more detail in the table below.

*Target Retirement Trusts – Assets and Fees (All Retirement Years).*

| Plan Years: | 2024 | 2023 | 2022 | 2021 | 2020 |
|---|---|---|---|---|---|
| Holdings | $412,035,306 | $360,575,827 | $293,988,522 | $352,312,561 | $294,486,137 |
| Fees @ 0.37% | $1,524,531 | $1,334,131 | $1,087,758 | $1,303,556 | $1,089,599 |
| Lowest Rate Available | 0.26% (Class K) | 0.26% (Class K) | 0.26% (Class K) | 0.27% (Class J) | 0.28% (Class H) |
| @ Lowest Rate | $1,071,292 | $937,497 | $764,370 | $951,244 | $824,561 |
| **Difference** | **$453,239** | **$396,633** | **$323,387** | **$352,312** | **$265,038** |

171.    In total, just during the Relevant Time Period, retaining participants' assets in the F share class rather than shifting them to the cheaper share classes has cost the Plan at least $1,790,610.  Because the Target Retirement Trust holdings remain in Class F today, data as to the Plan's Target Retirement Trust holdings in 2025 and 2026 will reveal further unnecessary costs to the Plan.

172.    Even these figures do not capture the full cost of retaining the F share class: the savings reflect monies that would have remained in participants' accounts and continued to compound over time.

173.    Defined contribution plans with substantial assets, like the Plan, have significant bargaining power and can demand lower cost share classes in the marketplace.

174.    Prudent, similarly-situated fiduciaries will use their bargaining power to select the lowest-priced share class available.

38

175.    Given the Plan's size, expected growth, and resulting negotiating power, with prudent management and administration, the Plan should unquestionably have been able to switch to share classes that were significantly lower cost than the F class fees above.    Because for a decade straight, the Plan could have switched to an otherwise-identical share class that was significantly cheaper, Snap-on's failure to do so (and Mercer's failure to recommend doing so) evidences Defendants' consistent failure to monitor the Plan's investments, and thus a breach of fiduciary duty.

176.    The Plan's IMP states that Mercer and the Committee are to monitor the costs of the Plan's investments every quarter.    The IMP specifically notes that Mercer will "monitor for lower cost share class or investment vehicles" and make recommendations to the Committee as "part of an on-going evaluation[.]"

177.    The persistent failure to move the investments into lower-cost share classes—ignoring at least nine new, cheaper share classes becoming available—evidences a deficient process by which fund expenses were considered, compared, and evaluated by the Plan fiduciaries: the fiduciaries either did not monitor for lower cost share classes as the IMP states, did not realize that lower-cost share classes were available, did not appreciate the benefit of transferring the Plan's holdings into those share classes, or intentionally disregarded those benefits.    In any of these scenarios, Defendants failed to prudently monitor the Target Retirement Trusts' costs as ERISA requires.    In other words, even to the extent that following the processes and procedures in the IMP would have been sufficient for Defendants to comply with their fiduciary and other legal obligations, Defendants simply did not follow them.

**VI.    Throughout the Relevant Time Period, Snap-on Has Paid Mercer at least $150,000 from Plan Assets.**

178.    As part of its fiduciary duties under ERISA, Snap-on is prohibited from paying parties-in-interest using the assets of the Plan.

179.    The Plan's Forms 5500 during the Relevant Time Period state that Mercer was paid $25,000 per year directly by the Plan.

180.    When service providers such as Mercer are paid directly by a plan, those fees are drawn from the Plan's assets.    In other words, each participant pays for Mercer's services quarterly from their investment account balance.

181.    The most recent audit of the Plan, appended to the Plan's Form 5500 for Plan Year 2024, states that "fees are deducted from each participant's account each calendar quarter."    It also states that investment management / consulting fees "may be paid by the Company[,]" but does not state that they must be paid by the Company.

182.    During the Relevant Time Period, Defendant Snap-on caused the Plan to pay management fees to Mercer that far exceeded the reasonable market rate.

183.    Since 2020, Mercer has charged the plan an average of $25,000 per year for its services.    Defendant Snap-on has submitted an exhibit in this Action confirming that it paid Mercer at least $150,000 during the Relevant Time Period. (D.E. 38-3).

184.    Defendant Snap-on's exhibit also confirms that contemporaneously with each quarterly payment during the Relevant Time Period, it understood and acknowledged that it was paying Mercer with Plan assets.

40

## CLASS ACTION ALLEGATIONS

185.    ERISA authorizes any plan participant or beneficiary to bring an action individually on behalf of the plan for appropriate relief under 29 U.S.C. § 1109(a) for a plan fiduciary's breach of duty, including all losses resulting from such breach and such other equitable or remedial relief the court may deem appropriate. *See* 29 U.S.C. § 1132(a)(2).

186.    Acting in this representative capacity, and as an alternative to numerous direct individual actions brought by participants on behalf of the Plan under 29 U.S.C. § 1132(a)(2), Plaintiff seeks to certify this action on behalf of all participants and beneficiaries of the Plan.

187.    Plaintiff seeks to certify the following class, and to be appointed as the representative on behalf of the following class:

> All participants and beneficiaries in the Snap-on Incorporated 401(k) Savings Plan at any time during the Relevant Time Period.

Excluded from the Class are Defendants and the Judge to whom this case is assigned or any other judicial officer having responsibility for this case.

188.    The Relevant Time Period is defined as six years prior to the filing of this Complaint and continuing through the date of judgment in this action.

189.    The Class includes thousands of members and is so large that joinder of all its members is impracticable, pursuant to Federal Rule of Civil Procedure 23(a)(1).

190.    There are questions of law and fact common to this Class pursuant to Federal Rule of Civil Procedure 23(a)(2), because Defendants owe fiduciary duties to the Plan and took the acts and omissions alleged as to the Plan and not as to any

41

individual participant.  Common questions of law and fact include but are not limited to:

    a.  Whether Defendants are fiduciaries of the Plan;

    b.  Whether, for how long, and how deeply the JPMorgan U.S. Equity Fund underperformed its benchmark;

    c.  Whether, for how long, and to what extent the JPMorgan U.S. Equity Fund displayed excessive volatility and/or turnover;

    d.  Whether, for how long, and how deeply the Value Trust underperformed its benchmarks;

    e.  Whether, for how long, and to what extent the Value Trust displayed excessive volatility and/or turnover;

    f.  Whether and for how long the Plan qualified for lower-cost share classes of the Target Retirement Trusts;

    g.  Whether Defendants breached their fiduciary duties under ERISA by failing to take action against the underperforming and needlessly-expensive Funds after years of warning signs;

    h.  Whether Defendant Snap-on breached its fiduciary duties under ERISA to monitor the performance of its appointed fiduciaries on the Committee, or of its engaged financial advisor, Mercer;

    i.  Whether any Defendant's breach enabled the breach of one or more of its co-Defendants;

j. Whether any Defendant knew of any of its co-Defendants' breaches of fiduciary duty, and if so, what efforts it made to remedy those breaches;

k. Whether Defendant Snap-on engaged in prohibited transactions by paying Mercer using Plan assets;

l. Whether the Plan suffered losses from Defendants' breach(es);

m. The manner in which the Plan's losses can be calculated; and

n. What equitable relief, if any, is appropriate for Defendants' breach(es).

191. Plaintiff's claims are typical of the claims of the Class pursuant to Federal Rule of Civil Procedure 23(a)(3) because Plaintiff was a Plan participant during the time period at issue and the participants in the Plan were harmed by Defendant's fiduciary misconduct in the same manner.

192. Plaintiff will adequately represent the Class pursuant to Federal Rule of Civil Procedure 23(a)(4), because he was a Plan participant in the Plan during the Relevant Time Period, has no interest that conflicts with the Class, is committed to the vigorous representation of the Class, and has engaged experienced and competent counsel to represent the Class.

193. Certification is appropriate under Federal Rule of Civil Procedure 23(b)(1), because prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (1) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants concerning their discharge of fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a), and (2) adjudications by individual

43

participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries who are not parties to the adjudication, or would substantially impair those participants' and beneficiaries' ability to protect their interests.

194.    Certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

195.    Plaintiff's attorneys are experienced in complex employment class actions, including ERISA litigation, and will adequately represent the Class.

**FIRST CLAIM FOR RELIEF**
**Breach of Fiduciary Duties Under ERISA**
**Against All Defendants**

196.    Plaintiff re-alleges and incorporates the prior paragraphs of this Complaint as if fully set forth herein.

197.    By exercising authority and/or control with respect to the management of the Plan and their assets, and/or by being designated in the governing document of the Plan as a fiduciary, Defendants Snap-on and the Committee are fiduciaries of the Plan within the meaning of ERISA §§ 3(21) and 402(a), 29 U.S.C. §§ 1002(21) and 1102(a)

198.    By rendering investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or any other property of the Plan, or having

44

any authority or responsibility to do so, Defendant Mercer is a fiduciary of the Plan within the meaning of ERISA § 3(21)(A)(ii), 29 U.S.C. § 1002(21)(A)(ii).

199.   ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B), imposes a fiduciary duty of prudence upon Defendants in managing the investments of the Plan.

200.   ERISA requires Defendants to discharge their duties to the Plan and participants with the care, skill, prudence, and diligence of a competent investment fiduciary charged with responsibility for investing millions of dollars of retirement savings on behalf of thousands of investors.

201.   Defendants, as fiduciaries of the Plan, are responsible for selecting and maintaining prudent investment options and taking any other necessary steps within their fiduciary authority to ensure that the Plan's assets are invested prudently.

202.   Among Defendants' fiduciary duties under ERISA is the continuing duty to monitor the performance and costs of the Plan's investment options, and remove those which are imprudent, whether they are imprudent from their initial selection or become imprudent in time.

203.   Common law and ERISA's duty of prudence required Defendants to give appropriate consideration to those facts and circumstances that, given the scope of their fiduciary investment duties, they knew or should have known were relevant to the particular investments of the Plan and to act accordingly.  *See* 29 C.F.R. § 2550.404a-1.

204.   During the Relevant Time Period, Defendants breached their fiduciary duties of prudence to Plan participants, including to Plaintiff, by failing to monitor

the Plan's investments and expenses and remove imprudent ones. This can be reasonably inferred because:

    a. Defendants Snap-on and the Committee maintained the Funds in the Plan (and Defendant Mercer failed to recommend their removal), though the JPMorgan U.S. Equity Fund and Value Trust significantly underperformed their benchmarks, displayed excessive volatility, and displayed excessive turnover, for as many as ten years in a row; and

    b. Defendants Snap-on and the Committee failed to move the Plan assets invested in the T. Rowe Price Target Retirement Trusts into available lower-cost share classes, for which the Plan qualified throughout the Relevant Time Period (and Defendant Mercer failed to recommend the same).

205. The persistent, years-long failure by Defendants to notice, appreciate, and/or take action to protect the Plan from the glaring red flags in cost and performance evidences fatal deficiencies in the process by which Defendants monitored, evaluated, and retained the investments on the menu and the expenses of the Plan.

206. Defendants' monitoring and evaluation process moreover utilized fundamentally flawed techniques, including by using investment data improperly and contrary to clear instructions from the publishers of the data.

207. Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that

a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, thereby breaching their fiduciary duties of prudence under 29 U.S.C. § 1104(a)(1)(B).

208.    As a result of Defendants' breach of fiduciary duty of prudence with respect to the Plan, the Plaintiff and Plan participants and beneficiaries suffered tens of millions of dollars in unreasonable and unnecessary monetary losses.

209.    Defendants are liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the Plan the losses resulting from the fiduciary breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breach of fiduciary duty alleged in this Count. In addition, Defendants are subject to other equitable relief pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2).    Total losses to the Plan will be determined at trial after complete discovery in this case and are illustrated herein based upon the limited information that has been available to the Plan's participants to date.

210.    Defendant Snap-on's failure to monitor its appointees enabled the Committee and Mercer to breach their own duties to monitor the performance and costs of the Plan's investments.    Therefore, Snap-on is liable for the breaches of the Committee and Mercer under ERISA § 405(a)(2), 29 U.S.C. § 1105(a)(2).

211.    None of the Defendants made any efforts to remedy the breaches of the other Defendants.    Therefore, to the extent any Defendant had knowledge of the any other Defendant's breach of duty, it will be liable for the other Defendant's breach under ERISA § 405(a)(3), 29 U.S.C. § 1105(a)(3).

**SECOND CLAIM FOR RELIEF**
**Failure to Adequately Monitor Other Fiduciaries Under ERISA**
**Against Defendant Snap-on**

212. Plaintiff re-alleges and incorporates the prior paragraphs of this Complaint as if fully set forth herein.

213. Defendant Snap-on had the authority to appoint and remove members or individuals responsible for Plan investment management on the Committee, and was aware that these fiduciaries had critical responsibilities for the Plan.

214. In light of this authority, Snap-on had a duty to monitor those individuals responsible for Plan investment management on the Committee to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

215. Snap-on had a duty to ensure that the individuals responsible for Plan investment management on the Committee possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Snap-on.

216. Snap-on breached its duty to monitor the Committee by failing to monitor for, proactively prevent, and/or retroactively remedy *the Committee's* failure to monitor the performance and fees of the Funds, even though the Committee:

    a. Was charged with reviewing the Funds' performance and fees quarterly, including the availability of lower-cost share classes; and

b. Was authorized to remove the Funds from the menu for underperformance or excessive fees; but

c. Failed to remove the Funds from the menu, despite years of signals that the JPMorgan U.S. Equity Fund and Value Trust consistently and significantly underperformed their benchmarks and displayed excessive volatility and turnover; and

d. Ignored for years the cost savings presented by available lower-cost share classes of the T. Rowe Price Target Retirement Trusts for which the Plan qualified; and

e. Failed to follow clear publisher instructions to prevent overestimating investment returns in peer comparisons; and thus

f. Was either (1) not performing its duties to monitor the performance and fees of the Funds at all, or (2) performing its duties in a manner not in compliance with the terms of the plan, the statutory standards, or the needs of the plan.

217. That the above behavior by the Committee persisted for years demonstrates deficiencies in the process by which Snap-on reviewed the Committee's performance in compliance with its own fiduciary duties. Snap-on was either not reviewing the Committee's performance at all, not reviewing it with sufficient regularity, or not reviewing it with sufficient rigor as to detect the Committee's neglect of its fiduciary duties.

218. Defendant Snap-on (by and through its constituent employees or agents on the Committee) also had authority to engage or disengage Mercer as a fiduciary investment advisor to the Plan, and was aware that Mercer had critical responsibilities for the Plan.

219. In light of this authority, Snap-on (by and through its constituent employees or agents on the Committee) had a duty to monitor those Mercer personnel responsible for Plan investment advising, to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individual advisors were not fulfilling those duties.

220. Snap-on (by and through its constituent employees or agents on the Committee) had a duty to ensure that the Mercer personnel responsible for Plan investment advising possessed the needed qualifications and experience to carry out their duties; had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to the Committee.

221. Snap-on (by and through its constituent employees or agents on the Committee) breached its duty to monitor Mercer by failing to monitor for, actively prevent, and/or retroactively remedy *Mercer's* failure to monitor the performance and fees of the Funds, even though Mercer:

    a. Was engaged to review the Funds' performance and fees quarterly, including the availability of lower-cost share classes; and

b.  Was empowered to recommend removal of the Funds from the menu for underperformance or excessive fees; but

c.  Failed to recommend removal of the Funds from the menu, despite years of signals that the JPMorgan U.S. Equity Fund and Value Trust consistently and significantly underperformed their benchmarks and displayed excessive volatility and turnover; and

d.  Failed to recommend transfer of the Target Retirement Trust assets into available lower-cost share classes for which the Plan qualified throughout the Relevant Time Period; and

e.  Failed to recommend following clear publisher instructions to prevent overestimating investment returns in peer comparisons; and thus

f.  Was either (1) not performing its duties to monitor the performance and fees of the Funds at all, or (2) performing its duties in a manner not in compliance with the terms of the plan, the statutory standards, or the needs of the plan.

222.    That the above behavior by Mercer persisted for years—and indeed, that Mercer remains engaged as an advisor to the Plan—demonstrates deficiencies in the process by which Snap-on (by and through its constituent employees or agents on the Committee) reviewed Mercer's performance in compliance with its own fiduciary duties.  Snap-on was either not reviewing Mercer's performance at all, not reviewing it with sufficient regularity, or not reviewing it with sufficient rigor as to

51

detect Mercer's neglect of its fiduciary duties to monitor the costs and performance of the investments.

223.    As a result of Snap-on's foregoing breaches of the duty to monitor, the Plaintiff and Plan Participants suffered unreasonable and unnecessary monetary losses amounting to tens of millions of dollars.  Had Snap-on discharged its fiduciary duties prudently as described above, the losses suffered by the Plan would have been minimized or avoided.

224.    Pursuant to ERISA §§ 409(a) and 502(a)(2), 29 U.S.C. §§ 1109(a) and 1132(a)(2), Snap-on is liable to restore to the Plan all loses caused by its failure to adequately monitor the Committee and Mercer.  Plaintiff and the Class are also entitled to equitable relief and other appropriate relief as appropriate.

### THIRD CLAIM FOR RELIEF
**Prohibited Transactions**
**Against Defendant Snap-on**

225.    Plaintiff re-alleges and incorporates the prior paragraphs of this Complaint as if fully set forth herein.

226.    ERISA § 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C), requires a plan fiduciary to refrain from engaging in a transaction if he knows or should know that the transaction constitutes a direct or indirect furnishing of goods, services, or facilities between the plan and a party in interest.

227.    ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), requires a plan fiduciary to refrain from engaging a transaction if he knows or should know that the transaction constitutes a transfer to, or use by or for the benefit of a party in interest, of any assets of the plan.

52

228.    By exercising authority and/or control with respect to the management of the Plan and their assets, and/or by being designated in the governing document of the Plan as a fiduciary within the meaning of ERISA § 402(a), 29 U.S.C. § 1102(a), Defendant Snap-on is a fiduciary of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), and ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1).

229.    By rendering investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or any other property of the Plan, or having any authority or responsibility to do so, Defendant Mercer is a fiduciary of the Plan within the meaning of ERISA § 3(21)(A)(ii), 29 U.S.C. § 1002(21)(A)(ii).

230.    As a fiduciary of the Plan, and/or as a service provider to the Plan, Defendant Mercer is a party in interest to the Plan within the meaning of ERISA § 3(14), 29 U.S.C. § 1002(14).

231.    Snap-on violated ERISA § 406(a)(1)(C), 19 U.S.C. § 1106(a)(1)(C) by engaging in a series of transactions that it knew or should have known constituted a direct or indirect furnishing of goods, services, or facilities between the Plan and Mercer as a party in interest.  Namely, it paid Mercer at least $150,000 from Plan assets during the Relevant Time Period, and confirmed in contemporaneous writings that it understood and acknowledged it was doing so.

232.    Snap-on violated ERISA § 406(a)(1)(D), 19 U.S.C. § 1106(a)(1)(D) by engaging in a series of transactions that it knew or should have known constituted a transfer to, or use by or for the benefit of Mercer as a party in interest, of Plan assets. Namely, it paid Mercer at least $150,000 from Plan assets during the Relevant Time

Period, and confirmed in contemporaneous writings that it understood and acknowledged it was doing so.

233. As a fiduciary, Snap-on is liable for these violations of ERISA §§ 406(a)(1)(C) and (D), 29 U.S.C. §§ 1106(a)(1)(C) and (D), pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2).

234. As a direct and proximate result of Snap-on's violation of ERISA §§ 406(a)(1)(C) and (D), the Plan has suffered at least $150,000 of damages, which continue to accrue each quarter.

235. Snap-on is liable to make good to the Plan as a whole the losses resulting from the aforementioned violation, and to restore to the Plan any profits resulting from the violation alleged in this Claim for Relief. Snap-on is subject to other Plan-wide equitable or remedial relief as appropriate.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Leslie Moore, on behalf of himself, the Class, and the Plan, prays the Court for a judgment against Defendants as follows:

1. Find and adjudge that Defendants have breached their fiduciary duties as described above;

2. Find and adjudge that Defendants are personally liable to make good to the Plan the losses to the Plan as a whole resulting from each breach of fiduciary duty, and to otherwise restore the Plan to the position they would have occupied but for the breaches of fiduciary duties;

54

3.      Order the Defendants to make good to the Plans as a whole the losses resulting from each breach of fiduciary duty and to restore to the Plans any profits resulting from each breach of fiduciary duty;

4.      Find and adjudge that the Defendants are liable to the Plan for appropriate Plan-wide equitable relief, including but not limited to restitution and disgorgement;

5.      Determine the method by which losses to the Plan under ERISA § 409(a), 29 U.S.C. § 1109(a), should be calculated;

6.      Order Defendants to provide all accountings necessary to determine the amounts Defendants must make good to the Plan under ERISA § 409(a), 29 U.S.C. § 1109(a);

7.      Impose surcharges against Defendants and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive, and/or in violation of ERISA;

8.      Order the proceeds of any Plan-wide recovery for the Plan to be allocated to the accounts of members of the Class to make them whole for any injury that they have suffered as a result of the breaches of ERISA in accordance with the Court's declaration;

9.      Certify the Class, appoint the Plaintiff as class representative;

10.     Award to the Plaintiff and the Class their attorney's fees and costs under ERISA § 502(g)(1), 29 U.S.C. § 1132(g)(1), and the common fund doctrine;

11.     Order Defendants to pay interest to the extent allowed by law; and

12.    Grant such other equitable or remedial relief as the Court deems proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

This the 29th day of May, 2026.

Respectfully submitted,

**LEE SEGUI, PLLC**

*/s/ Kathryn Anne B. Robinson*
Kathryn Anne B. Robinson
PA Bar No. 335382
Kyle A. Medin**
N.C. Bar No. 54920
Matthew E. Lee**
N.C. Bar No.  35405
Jeremy R. Williams*
N.C. Bar No. 48162
421 N. Harrington Street
Suite 460
Raleigh, NC 27603
Phone: (919) 600-5000
Fax: (919) 600-5035
krobinson@leesegui.com
kmedin@leesegui.com
mlee@leesegui.com
jwilliams@leesegui.com

*Attorneys for the Plaintiff, the Plan, and the Proposed Class*

* admitted *pro hac vice*
** to be admitted *pro hac vice*

56

## NOTICE PURSUANT TO ERISA § 502(h)

To ensure compliance with the requirements of Section 502(h) of ERISA, 29 U.S.C. § 1132(h), the undersigned hereby affirms that, on this date, a true and correct copy of this Complaint was served upon the Secretary of Labor and the Secretary of the Treasury by certified mail, return receipt requested.

This the 29th day of May, 2026.

Respectfully submitted,

**LEE SEGUI, PLLC**

*/s/ Kathryn Anne B. Robinson*
Kathryn Anne B. Robinson
PA Bar No. 335382
Kyle A. Medin**
N.C. Bar No. 54920
Matthew E. Lee**
N.C. Bar No.  35405
Jeremy R. Williams*
N.C. Bar No. 48162
421 N. Harrington Street
Suite 460
Raleigh, NC 27603
Phone: (919) 600-5000
Fax: (919) 600-5035
krobinson@leesegui.com
kmedin@leesegui.com
mlee@leesegui.com
jwilliams@leesegui.com

*Attorneys for the Plaintiff, the Plan, and the Proposed Class*

* admitted *pro hac vice*
** to be admitted *pro hac vice*

57